[Cite as *Mid Am. Constr., L.L.C. v. Univ. of Akron*, 2019-Ohio-3863.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

Mid American Construction, LLC,      :

        Plaintiff/Counter      :
        Defendant-Appellee,

                                :

v.                                 :

The University of Akron,                                                                                              :

                           :         No. 18AP-846
        Defendant/Counter Plaintiff/          (Ct. of Cl. No. 2016-00685JD)
        Third-Party Plaintiff-Appellant, :

                                        (REGULAR CALENDAR)

v.                                 :

The Fidelity and Deposit Company      :
of Maryland,

                                :

        Third-Party                    :
        Defendant-Appellee,          :

## D E C I S I O N

### Rendered on September 24, 2019

**On brief:** *Roetzel & Andress, LPA, Thomas L. Rosenberg, Stephen W. Funk*, and *Nathan Pangrace, for appellees.* **Argued:** *Thomas L. Rosenberg.*

**On brief:** *Dave Yost*, Attorney General, *William C. Becker, James E. Rook*, and *Howard H. Harcha, IV*, for appellant. **Argued:** *William C. Becker.*

APPEAL from the Court of Claims of Ohio

SADLER, J.

{¶ 1} Defendant/counter plaintiff/third-party plaintiff-appellant, The University of Akron ("University"), appeals from a judgment of the Court of Claims of Ohio in favor of

plaintiff/counter defendant-appellee, Mid American Construction, LLC ("MAC"), and third-party defendant-appellee, Fidelity and Deposit Company of Maryland ("Fidelity"). For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}   MAC and the University executed a contract on December 12, 2014 ("original agreement"), whereby the University agreed to pay MAC a total of $5,137,700 to act as the general trades contractor for the Zook Hall Renovation Project Phase 2B ("project"). (MAC's Ex. 2.)   MAC was not involved with the project's previous phases, which involved demolition and asbestos abatement work along with work on another site to be used as transitional space.   MAC's work included, among other items, patching, painting, framing and other carpentry work, tile work, and drywall work.   (MAC's Ex. 2.)   In accordance with the parties' statutory obligations, MAC executed a surety bond in favor of the University and issued by Fidelity in the penal amount of $5,137,700.

{¶ 3}   The project was a multi-prime project, which meant the University executed separate agreements with several other contractors including Didado for mechanical, electric, and plumbing ("MEP"), Hampton for fire protection, and S.A. Comunale for HVAC.   The scope of MAC's work as general trades contractor included many of the interior finishes in Zook Hall, including the lecture hall/auditorium, classrooms, the science laboratory, the mail room, and various staff offices.   MAC's work on the exterior of the building was extensive including the construction of a glass storefront addition on the ground floor and a glass curtain wall addition for the first and second floors with a third floor terrace.   MAC's scope of work also included the exterior doors, windows, and a new roof.

{¶ 4}   MAC did not self-perform any of its construction work on the project.   Rather, MAC completed its work through the use of subcontractors and suppliers.   Dan Trinetti, MAC's senior project manager, handled day-to-day operations on the project.   Chad Zumkehr is MAC's owner and president.

{¶ 5}   The University also executed separate contracts with a construction manager ("CM"), Thomarios, and a project architect ("A/E"), Stantec.   Thomarios employed George Brkich as its project manager.   In addition to coordinating the day-to-day activities of the prime contractors, Thomarios drafted the baseline schedule, the conformed schedule, and

all schedule updates throughout the project.  Thomarios employee Ted Whitcomb drafted the baseline schedule prior to the start of the project and later drafted the conformed schedule, which included addenda.

{¶ 6}  Stantec provided architectural design services and construction administration services and contracted with another firm for engineering services.  Stantec employed certified professional architect Ryan McNutt as its project manager.  James Haskell, the University's Director of Campus Planning and Space Utilization, acted as the University's project manager and primary representative on the project.

{¶ 7}  MAC began work on the project in January 2015.  The original agreement provided 401 days for completion of the project.  Almost immediately, the project experienced delay.  An initial delay occurred when the University Dean objected to the placement of MAC's mixing silos near the southeast corner of Zook Hall, as they could be seen from his office.  MAC was required to move its silos to a less advantageous position to accommodate the University, though MAC was compensated for the expense.

{¶ 8}  Numerous other delays occurred on the project thereafter.  MAC has argued that a vast majority of the delays were the result of Stantec's and/or Thomarios' untimely execution and delivery of construction change directives ("CCDs").  In this litigation, the University attributed every day of project delay to MAC and stopped paying MAC and its subcontractors on or about September 30, 2015.  On December 18, 2015, the University sent MAC a five-day notice of termination, pursuant Section 11.3.1.1 of the general conditions, claiming that MAC failed "to prosecute the Work with the necessary force or in a timely manner."  (MAC's Ex. 2.)  The University requested that MAC submit a "recovery plan," pursuant to Section 6.6.13.1 of the original agreement, within 15 days and that MAC and a Fidelity representative meet with representatives of the University, Thomarios, and Stantec on December 22, 2015.

{¶ 9}  At the December 22, 2015 meeting, MAC, with the assistance of its scheduling consultant, James Dougherty, provided a recovery schedule showing that MAC was just 10 days behind schedule, not 83 days as the University had claimed.  MAC concedes it did not provide a "recovery plan," as that term is described in Section 6.6.13.2 of the original agreement, but MAC argues the failure of the University, Thomarios, and/or Stantec to provide Request for Information ("RFI") responses and approve CCDs prevented MAC

from drafting a recovery plan. At the December 22, 2015 meeting, Trinetti used a copy of the floor plan to highlight the areas of the building where there was an RFI pending or an outstanding CCD holding up MAC's work.

{¶ 10} On January 7, 2016, the University issued a Notice of Termination to MAC via email which was copied to Fidelity representative Dennis Walsh, wherein the University stated MAC was in "default of its obligations * * * on this project" and MAC's original agreement with the University is "terminated for cause." (University's Ex. C at 1.) The letter also demanded Fidelity notify the University, within ten days, of its intentions with regard to completion of the contract.

{¶ 11} MAC received an original signed Notice of Termination on January 13, 2016, four business days later. On or about January 11, 2016, the University denied MAC's subcontractors access to the project. On this same day, the University sent a letter to MAC informing it that subcontractors should cease work or risk not being paid. (MAC's Ex. 61.) At the time of termination, MAC had an outstanding pay application of approximately $1,200,000 for work completed through October 31, 2015. Adding retainage to that number raises the total to $1,455,998.11. (University's Ex. YYY.) The position of the University, however, was that MAC was not entitled to payment for this work because the University had terminated the original agreement for cause.

{¶ 12} Walsh testified when Fidelity received the January 7, 2016 Notice of Termination, Fidelity, as MAC's surety, had three options: (1) solicit bids from other qualified contractors and hire another contractor to complete MAC's work; (2) allow the University to hire a replacement contractor, in which case Fidelity would be on the hook for any payments to the replacement contractor above and beyond the remaining contract balance; or (3) allow MAC to complete the project under a takeover agreement. According to Walsh, because the University demanded an answer within ten days and because the University insisted that time was of the essence, Fidelity elected to complete the project using MAC as its contractor. Walsh testified Fidelity appointed MAC as the replacement contractor based on completion status, time constraints, and the recommendation of a construction consultant. Based on MAC's representations, Fidelity estimated the project was 85 percent complete at the time of termination.

{¶ 13} On or about January 13, 2016, Fidelity forwarded a new agreement ("takeover agreement") to the University. (MAC's Ex. 8.) The University did not execute the takeover agreement until February 25, 2016, and progress on the project was further delayed. Yet, the takeover agreement retained the original completion date of February 10, 2016. Even though Section 5 of the takeover agreement required the University to release the remaining contract funds to Fidelity, the University failed or refused to do so. Both Walsh and Zumkehr testified that MAC agreed to self-fund the work prosecuted under the takeover agreement.

{¶ 14} On March 15, 2016, the University sent a letter to MAC indicating it would not be paying MAC's recent payment applications based on MAC's termination for cause. MAC continued to self-fund work on the project under the takeover agreement until May 27, 2016, when MAC formally demobilized and left the project due to nonpayment. (MAC's Ex. 186.) In MAC's demobilization letter to the University, MAC claimed only six items would be left unfinished on demobilization.

{¶ 15} The project was finally completed on August 16, 2016, 188 days beyond the scheduled completion date of February 10, 2016. Stantec subsequently prepared an 81-page punch list that reportedly reflected unfinished or defective activities within MAC's scope of work. (University's Ex. GGG.) According to Trinetti, the University never provided the punch list to MAC prior to this litigation. On completion of the project, the University still retained approximately $1,200,000 in contract funds in an escrow account.

{¶ 16} MAC filed its complaint against the University asserting three claims, two breach of contract claims and an R.C. 1311.31 delay claim. The University filed an answer, counterclaim, and third-party complaint against Fidelity. The counterclaim alleges breach of contract and breach of warranty claims against MAC. The University's third-party complaint alleges Fidelity breached the original agreement and takeover agreement.[1]

{¶ 17} The Court of Claims conducted a seven-day bench trial beginning April 30, 2018. On October 1, 2018, the Court of Claims rendered judgment in favor of MAC on the complaint in the amount of $2,258,700 and against the University on the counterclaim and

---

[1] R.C. 2743.02(E) permits the state to "file a third-party complaint or counterclaim in any civil action, except a civil action for ten thousand dollars or less, that is filed in the court of claims." Civ.R. 19(A)(3) provides that "[a] person who is subject to service of process shall be joined as a party in the action if * * * he has an interest relating to the subject of the action as an assignor."

third-party complaint.  The University timely appealed to this court from the judgment of the Court of Claims.

## II.  ASSIGNMENTS OF ERROR

{¶ 18}  The University assigns the following as trial court error:

[1.] THE TRIAL COURT ERRED IN AWARDING DAMAGES TO A CONTRACTOR WITH WHICH THE UNIVERSITY OF AKRON WAS NOT IN CONTRACT.

[2.] THE TRIAL COURT ERRED IN FINDING MAC WAS ENTITLED TO DAMAGES BY VIRTUE OF AN ASSIGNMENT.

[3.] THE TRIAL COURT ERRED BY AWARDING MAC DAMAGES FOR WORK THAT IT NEVER PREFORMED.

[4.] THE TRIAL COURT ERRED IN NOT AWARDING THE UNIVERSITY THE AMOUNT OF MONEY IT SPENT TO COMPLETE MAC'S WORK OR FAILING TO OFF SET THE JUDGMENT TO MAC BY THAT AMOUNT.

[5.] THE TRIAL COURT ERRED IN FINDING THAT MAC WAS WRONGFULLY TERMINATED.

[6.] THE TRIAL COURT ERRED IN FINDING THAT THE UNIVERSITY HAS THE BURDEN OF PROOF THAT MAC WAS NOT WRONGFULLY TERMINATED.

[7.] THE TRIAL COURT ERRED IN DENYING THE UNIVERSITY STATUTORY DELAY DAMAGES.

## III.  LEGAL ANALYSIS

{¶ 19}  Because our resolution of the University's fifth and sixth assignments of error concerning MAC's breach of contract claims dispose of arguments made in support of several other assignments of error, we will consider them first.

### A.  University's Fifth Assignment of Error

{¶ 20}  In its fifth assignment of error, the University contends the Court of Claims erred when it determined that the University breached the original agreement with MAC. The University essentially argues that the Court of Claims' decision is against the manifest weight of the evidence.  We disagree.

{¶ 21}  Weight of the evidence concerns " ' "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' "  (Emphasis omitted.)  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-

Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Thus, in reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way." *Brown v. Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-804, 2014-Ohio-1810, ¶ 19, citing *Eastley* at ¶ 20.

{¶ 22} In applying the manifest-weight standard in a civil action, " 'the court of appeals "must always be mindful of the presumption in favor of the finder of fact." ' " *Miller v. Ohio Dept. of Transp.*, 10th Dist. No. 13AP-849, 2014-Ohio-3738, ¶ 44, quoting *Brown* at ¶ 19, quoting *Eastley* at ¶ 21. " 'A trial court's findings of fact are presumed correct, and "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to decide." ' " *Miller* at ¶ 44, quoting *Rex v. Univ. of Cincinnati College of Medicine,* 10th Dist. No. 13AP-397, 2013-Ohio-5110, ¶ 18, quoting *Eagle Land Title Agency, Inc. v. Affiliated Mtge. Co.*, 10th Dist. No. 95APG12-1617 (June 27, 1996).

{¶ 23} We note, even though appellant's fifth assignment of error speaks exclusively to the termination of the University's original agreement with MAC, the University raises arguments in support of the assignment of error concerning MAC's performance under the takeover agreement between the University and Fidelity. As a general rule, "courts of appeal decide appeals on assignments of error, not arguments or issues contained in a brief." *Wood v. Simmers*, 10th Dist. No. 17AP-269, 2017-Ohio-8718, ¶ 7, citing *Hamilton v. Hamilton*, 10th Dist. No. 14AP-1061, 2016-Ohio-5900, ¶ 9. However, MAC has responded to the arguments in its merit brief. Accordingly, we will not confine our discussion of appellant's fifth assignment of error to the termination of the original agreement.

{¶ 24} In support of the fifth assignment of error, the University argues that MAC's poor performance of the original agreement prompted the University to exercise its right to terminate the original agreement "for cause." (MAC's Ex. 2, Section 11.3.) Section 11.3.1 addresses termination for cause and states, in pertinent part, that the University "may terminate all or a portion of the Contract if the Contractor commits a *material breach* of the Contract including but not limited to * * * failure to prosecute the Work with the necessary force or in a timely manner." (Emphasis added.) (MAC's Ex. 2.) Section 11.3.2

states that if the University intended to exercise its termination rights under section 11.3, it "shall issue not less than 5 days' written notice to the Contractor and the Contractor's Surety in accordance with ORC Section 153.17 ('5-Day Notice')."  (MAC's Ex. 2.)

{¶ 25} Section 11.3.3 states "[i]f the Contractor fails to satisfy the requirements set forth in the 5-Day Notice within 15 days of receipt of the 5-Day Notice, the Contracting Authority may declare the Contractor in default, terminate the Contract, and employ upon the Work the additional force or supply materials or either as appropriate, and remove Defective Work."  (MAC's Ex. 2.)  Section 11.3.4 states, in pertinent part, "[i]f the Contract is terminated, the Contractor's Surety may perform the Contract."  (MAC's Ex. 2.)  Section 11.3.5 states "[*i*]*f the Contract is terminated* [*for cause*]*, the Contractor shall not be entitled to further payment.*"  (Emphasis added.)  (MAC's Ex. 2.)

{¶ 26} MAC argues, and the Court of Claims agreed, the University did not have cause to terminate the contract, and, therefore, the termination is deemed a "termination for convenience."  (MAC's Ex. 2, Section 11.2.)  Section 11.2.1 addresses termination for convenience and states "[t]he Contracting Authority may, at any time, terminate the Contract in whole or in part for the Owner's convenience and without cause, at any time upon 10 days' written notice to the Contractor." (MAC's Ex. 2.)  Section 11.2.3 states "[u]pon termination, the Contracting Authority shall pay the Contractor in accordance with the Schedule of Values for Work completed, including any retained funds, and the value of materials ordered and delivered, less any salvage credit the Contractor may receive for them."  (MAC's Ex. 2.)  Section 11.2.3.2 states "[t]he Contractor is entitled to a fair and reasonable profit for Work performed and reasonable expenses directly attributable to termination of the contract.  In no event shall the Contractor be entitled to (1) Contractor's Fee on Work not performed or (2) compensation in excess of the total Contract Sum." (MAC's Ex. 2.)

{¶ 27} At trial, the University made two arguments in support of the "for cause" termination of the original agreement pursuant to Section 11.3.1.  First, the University alleged that MAC committed a *material breach* of the original agreement by failing to prosecute the Work with the necessary force or in a timely manner.  More particularly, the University alleged that MAC was 83 days behind the project schedule.  Second, the University alleged that MAC defaulted on its obligation under Section 11.3.3 of the original

agreement by failing to satisfy the requirements of the 5-day notice issued by the University within 15 days of receipt. More particularly, the University claimed that MAC failed to submit a recovery plan as defined in Section 6.6.13.2.[2]

{¶ 28} The Court of Claims found MAC was not the only responsible cause of the project delays of which the University complained, and, therefore, the University did not have cause to terminate the original agreement with MAC. The Court of Claims further concluded the University beached the original agreement by failing to pay MAC for the work it had completed on the project prior to a termination for convenience. The weight of the evidence supports the ruling of the Court of Claims.

### 1. Project Delays

{¶ 29} In reaching the conclusion that the University breached the original agreement, the Court of Claims found that the conduct of Stantec and Thomarios, in failing to satisfy their respective contractual obligations on the project, caused or contributed to the delays for which the University terminated MAC. For example, the Court of Claims found that Stantec's failure to provide clarification on conflicts, discrepancies, and ambiguities in the project plans and construction documents delayed MAC's work on the project. The Court of Claims also found that the project schedule developed and maintained by Thomarios contained numerous flaws that delayed MAC's work and that further delays resulted from the failure by Thomarios to coordinate the work of the prime contractors. The weight of the evidence supports the findings made by the Court of Claims.

### a. RFIs and CCDs

{¶ 30} The Court of Claims found that much of the delay on the project was due to the failure of the project architect, Stantec, to timely respond to numerous RFIs submitted by MAC and to timely issue fully executed CCDs and Change Orders. The Court of Claims made the following relevant findings:

> • MAC and other contractors could seek clarification on conflicts, discrepancies and ambiguities in the Contract Documents through requests for information (RFIs). Stantec had three days to respond to RFIs. (Ex. 2, General conditions § 6.10.2.3; Contracting definitions, p. 7 of 10).

---

[2] Section 6.6.13.2 states "[a] recovery plan shall include, but is not limited to, adjustments to * * * workforce[,] hours per shift[,] shifts per workday[,] workdays per week[,] equipment[, and] activity logic." (MAC's Ex. 2.)

• According to the request and answer log for the project (Ex. R), the contractors, sent 144 RFIs to Stantec from the beginning of the project in January of 2015 to the conclusion of the project in April of 2016. A review of the log indicates that 69 were answered on time while 75 were not. The log contains a heading titled "work impact." As to those RFIs not answered on time, 45 are noted as "work impeded" while the remainder are marked "unknown."

• From September of 2015 when questions first arose regarding the progress of MAC's work until the issuance of the termination letter on December 18, 2015, which appears to be the critical time-period in determining whether defendant properly terminated plaintiff for cause, 14 RFIs were answered on time and 23 were not.

• In some cases, weeks and even months would elapse with no response to MAC's RFIs.

• MAC did not receive a response to RFI No. 44 dated May 5, 2015, related to the removal of perlite concrete and other materials from Zook Hall's existing roof, until May 29, 2015 which hindered the progress of MAC's work in this area. (Ex. R; 17-19).

• RFI # 27 dated March 25, 2015, was responded to April 8, 2015 (Ex. R) and a CCD relative to this RFI was issued unsigned on February 9, 2016 which delayed work in the IT room.

• Absent a signed construction change directive (CCD), MAC could not proceed with changes to its work which differed from that set forth in the contract. Otherwise, MAC would waive any right to additional payment and/or adjustment of completion time. (Ex. 2, § 7.1.1.2 and § 7.1.1.3 of the General Conditions).

• CCDs would be returned to MAC unsigned. The University, through Thomarios and Stantec, (Ex. 53; 68) issued unsigned change directives 88 (Ex. 53) and 89 (Ex. 68) in January of 2016 requesting a change to MAC's work months after last paying MAC in September of 2015.

• CCD # 94, related to an issue in the mail room, was unsigned and was provided to MAC 11 months after the RFI was first submitted.[3]

---

[3] Section 7.1.1.1 states "[t]he Contracting Authority may order changes in the Work without invalidating the Contract. [A] change in the Work may be accomplished by a Change Order, Change Directive, or order for a minor change in the Work." (MAC's Ex. 2.) Section 7.1.1.2 states, in pertinent part, "[t]he Contractor shall not proceed with any change in the Work without the Contracting Authority's prior written authorization."

(Footnote omitted.)  (Oct. 1, 2018 Decision at 16-17.)

{¶ 31} Stantec's project manager, McNutt, did not dispute the information in the RFI logs, but he claimed that a Stantec employee orally responded to every RFI request by MAC within three days of receipt and that written responses were subsequently issued. McNutt also claimed that a great number of RFIs submitted by MAC were repetitive and duplicative of other RFIs that had been previously answered.  In concluding, however, that the University breached the original agreement, the Court of Claims found that the testimony of MAC's Senior Project Manager, Trinetti, was "credible and persuasive." (Decision at 21.)  The Court of Claims also found the testimony of MAC's scheduling expert, Dougherty, "more credible and convincing" than the testimony of the University's expert. (Decision at 23.)  Our review of Trinetti's trial testimony and the relevant exhibits supports the findings of the Court of Claims regarding the RFIs and CCDs in question.  Brkich acknowledged that MAC could not be faulted for refusing to proceed with work required by an unsigned CCD and that MAC could not be held responsible for any associated project delay.

{¶ 32} We note the University's merit brief in this case focuses on the delays allegedly caused by MAC in failing to achieve permanent enclosure of the structure.  The University contends that MAC's failure to permanently enclose the building delayed several other prime contractors from performing work, including the HVAC and fire protection contractor, S.A. Comunale, and the MEP contractors, Didado and Hampton.

{¶ 33} The evidence shows there were several issues that caused or contributed to the delay in achieving permanent enclosure of Zook Hall, such as the dispute regarding window blocking at the southeast storefront, details for replacing a missing structural steel support at the north curtain wall, and allegedly late and incomplete submittals by MAC and its subcontractor, Glazing Systems, regarding the attachment of the north curtain wall to the existing structure.

{¶ 34} The Court of Claims found that "[n]either party convinced the Court that the other should bear sole blame for the curtain wall's delay or any delays resulting from the window blocking disagreement.  Rather, the evidence established that the parties

---

(MAC's Ex. 2.)  Section 7.1.1.3 states, in pertinent part, "the Contractor's failure to obtain prior written authorization for a change in the Work constitutes a waiver by the Contractor of an adjustment to the Contract Sum or Contract Times, or both, for the related Work."  (MAC's Ex. 2.)

attempted to resolve a good faith disagreement about work on the project through contractual procedures and that concurrent causes contributed to delay these parts of the project." (Decision at 20-21.) The weight of the evidence supports these findings.

{¶ 35} With regard to window blocking, the evidence shows window blocking is wooden framing that is fitted inside a window sill in the exterior concrete wall. The plans suggest that blocking is to be installed as required by the manufacturer. Trinetti described the relative positions of the parties on this issue as follows:

> The conflict was * * * the position of the architect was taking was that your window needs the blocking and therefore, even though it's not shown, you've got to provide it. The window manufacturer does not require blocking. In fact, the whole first floor is installed on the sill without wood blocking because there is a precast sill there.
>
> When we exposed the conditions on the upper floors, that's when it reared its ugly head. And it became evident through the mock-up process that in order to get the water to deflect properly away from the sills at those windows, blocking needed to be installed.

(Tr. Vol. 1 at 139-40.)

{¶ 36} Trinetti testified when the architect insisted on the installation of wood blocking for certain storefront windows, MAC submitted an RFI seeking guidance as to the wood blocking required and the resulting change in the dimension of the window glass. MAC needed the requested information so that its subcontractor, Glazing Systems, could fabricate the glass. MAC's weekly status reports reflect MAC included the pending approval of the window blocking mock-up as a deficiency delaying MAC's work for six consecutive weeks.

{¶ 37} Similarly, Stantec required MAC to submit for Stantec's approval certain shop drawings (submittals), complete with engineering calculations, demonstrating how MAC and Glazing Systems intended to attach the curtain wall system to the existing structure. Trinetti testified the construction plans drafted by Stantec contained insufficient detail for MAC to determine how to attach the curtain wall system. Accordingly, MAC submitted RFIs to Stantec seeking guidance on the issue. Stantec took the position that the drawings adequately express the "design intent" and that the details necessary to safely and securely attach the curtain wall system to the existing structure were means and methods

issues within MAC's scope of work.  (Tr. Vol. 6 at 1253.)  The parties' good faith efforts to resolve the dispute delayed completion of the north curtain wall.

{¶ 38}  The evidence also shows a significant issue delaying the permanent enclosure of Zook Hall beyond the scheduled date occurred when it was discovered that a structural steel support was missing from the existing structure.  This condition was not contemplated in the construction plans and was revealed only after some initial demolition work had occurred.  The evidence shows MAC submitted an RFI in October 2015, seeking guidance regarding the dimensions for a new steel support in order to forward the information to its supplier and fabricator.  The testimony reveals that a copy of CCD 79, providing the necessary detail, was not provided to MAC until February 23, 2016.  The signed version of CCD 79 is dated March 25, 2016.  (MAC's Ex. 29.)  Trinetti testified MAC could not attain permanent building closure unless and until CCD 79 was fully executed.  McNutt corroborated Trinetti's testimony when he admitted that a complete and permanent building enclosure could not be accomplished until CCD 79 was properly executed.  He also acknowledged that CCD 79 was not fully executed until March 2016.

{¶ 39}  Because the evidence in the record supports a finding that the execution of CCD 79 by Stantec delayed permanent enclosure of Zook Hall past the scheduled completion date of the project, and because the weight of the evidence shows that MAC was not at fault either for the unexpected site condition that lead to CCD 79 or the delay in executing CCD 79, MAC proved that the delay in completing permanent closure of Zook Hall and the resulting impact on other contractors cannot be attributed solely to MAC.

### b.  Schedule Deficiencies and Lack of Coordination

{¶ 40}  The Court of Claims also found that delays on the project were attributable to the University's construction manager, Thomarios.[4]  The original agreement contains the following provisions related to the project schedule.  Section 6.5.3 states "[t]he CM shall develop and keep current the Construction Progress Schedule in accordance with Section 6.6, and prepare and keep current a schedule of submittals that is coordinated with the Construction Progress Schedule, for the A/E and Contracting Authority's acceptance." (MAC's Ex. 2.)  Section 6.5.5 states "[t]he CM shall use the Construction Progress Schedule to plan, organize, and execute the Project, record and report actual performance and

---

[4] The contract between Thomarios and the University was admitted into evidence as Plaintiff's Exhibit 4.

progress, and show how it plans to coordinate and complete all remaining work by the Contract Completion date."  (MAC's Ex. 2.)  Section 6.5.6 states "[t]he CM shall monitor the progress of the Work for conformance with the Construction Progress Schedule and shall initiate revisions as required by Section 6.6.14."  (MAC's Ex. 2.)

{¶ 41}  Dougherty works for a company known as NV5, formerly known as DCK Worldwide, as Director of Scheduling.  NV5 provides scheduling consulting services as well as consulting on other construction related activities.  Dougherty is a certified professional scheduler and planner.  He was first contacted by Trinetti in December 2015 and asked to review the current project schedule for the Zook Hall project.

{¶ 42}  Dougherty explained that in a well-developed project schedule only the start date will have no predecessor activity and the completion date will have no successor activity.  Otherwise, each activity on the schedule should have a predecessor and a successor activity.  Dougherty testified the logic of the schedule should eliminate out-of-sequence activities.  For example, an activity such as drywall should not be scheduled to take place prior to an MEP rough-in and inspection.

{¶ 43}  Using Primavera scheduling software, the industry standard, Dougherty ran a scheduling diagnostic on Thomarios' project schedule number eight, allegedly representing work completed on the project through November 30, 2015.  According to the University, schedule number eight showed that MAC was 83 days behind schedule and identified a completion date of May 26, 2016.  According to Dougherty, the scheduling diagnostic revealed 34 out-of-sequence activities, 32 activities without predecessors, and 39 activities without successors.  Dougherty testified 19 of the activities without predecessors were within MAC's scope of work and that 15 of the out-of-sequence activities were within MAC's scope of work.

{¶ 44}  Dougherty testified it was other prime contractors who were driving the completion date of the project, not MAC.  For example, Dougherty opined that the MEP contractor was driving the completion date for the north addition and that MAC's activities along the same critical path, such as drywall and painting, were dependent on the MEP "rough-ins."  (Tr. Vol. 4 at 874.)  Dougherty noted that the inspections required at the completion of certain activities were not noted in the schedule and that MAC could not begin its work on certain successor activities unless and until predecessor activities were

completed by other contractors, including required inspections.  He also stated the MEP was driving work on the third floor.  According to Dougherty, when he corrected the errors and omissions in schedule number eight and recalculated a completion date, he discovered that MAC was just 10 days behind schedule, not 83 days as the University had claimed.

{¶ 45}  Dougherty also testified the execution of pending CCD 89 was the "key event that has to occur" for the completion of the southeast entrance to Zook Hall.  (Tr. Vol. 4 at 883.)  The evidence shows that RFI No. 108, seeking details regarding the new stone lintel to be installed over the southeast storefront, SF-10, was submitted by MAC on December 4, 2015 but that Stantec did not provide a final resolution of RFI No. 108, culminating in CCD 89, until January 5, 2016.

{¶ 46} The Court of Claims also made findings to support its conclusion that scheduling deficiencies resulted in measureable delays to the project.  For example, the Court of Claims found the baseline schedule for the project was "not approved until April 16, 2015," even though the project documents required the schedule to be produced in early February 2015.[5]  (Decision at 17.)  The Court of Claims noted that "Brkich testified to delay resulting from the 'stacking' of the prime contractors' work such that their work overlapped with one another on the same floor of Zook Hall, resulting in delay."  (Decision at 17.)  Brkich testified the project was on schedule in early September, but by October the project was 20 days behind schedule.  Brkich explained how the stacking of prime contractors affected the work as follows:

> That's how bad it got * * * the months coming up to September, October, the floors ended up overlapping, the work wasn't getting done, they weren't meeting their targets. So now not only [were] they * * * working on four and three, now they're working on four, three and two.  And then the next month it got even further [behind] because we were stacking the floors and you had contractors working on all the different floors.

 (Tr. Vol. 3 at 782-83.)

{¶ 47} When the Court of Claims' judge asked Brkich how the project could get 20 days behind when all the prime contractors, including MAC, were working during that time

---

[5] Section 6.6.7 of the original agreement states, in pertinent part, "[w]ithin 30 days of the date of the Notice to Proceed, the CM shall submit to the A/E a proposed Construction Progress Schedule approved by all Contractors."  (MAC's Ex. 2.)

period, Brkich responded: "There wasn't much getting complete. It was not good." (Tr. Vol. 3 at 783.)

{¶ 48} The University presented the testimony of its own scheduling expert, Robert Kelly. Kelly testified MAC caused significant delays in the project by failing to permanently enclose the structure until March 2016 and by failing to timely complete the north curtain wall addition. The Court of Claims noted that Kelly opined "in the most conclusory fashion" that the delayed responses to RFIs and delayed execution of CCDs had no effect on the completion date for the project and that neither Stantec, Thomarios, or the University caused or contributed to the project delays. (Decision at 23.) As previously noted, the Court of Claims found Dougherty's testimony "more credible and convincing" than Kelly's. (Decision at 23.) Moreover, some of the delay Kelly attributed to MAC allegedly occurred subsequent to the termination of the original agreement.

{¶ 49} In addition to the scheduling deficiencies and resulting delays, the Court of Claims found Thomarios caused or contributed to delays on the project by failing to coordinate the work of the prime contractors and facilitate the distribution of information among the prime contractors. The original agreement contains the following relevant provisions:

> Section 6.6.1 The Contractor and each Separate Contractor shall provide information to the CM as the basis of the Construction Progress Schedule for the Project. * * *
>
> * * *
>
> Section 6.6.10 For each progress meeting, the CM shall provide a 2- to 6-week look-ahead schedule, as appropriate for the Project.
>
> Section 6.6.11 On a weekly basis, the Contractor shall prepare and submit to the CM and A/E a written report describing: * * * activities begun or finished during the preceding week; * * * activities in progress and expected completion; [and] activities to be started or finished in the upcoming 2 weeks. * * *
>
> Section 6.6.12 The CM shall attach [the information required by 6.6.11] to the minutes of the weekly progress meetings.
>
> Section 6.6.13 The CM shall provide monthly Progress Status Reports to the Contracting Authority, CM, A/E, and Owner, which shall include recommendations for adjusting the

Construction Progress Schedule to meet Milestone dates and
the Substantial Completion date.

(MAC's Ex. 2.)

{¶ 50} The Court of Claims found Thomarios failed to comply with a great many of the provisions in Section 6.6 of the original agreement. Specifically, the Court of Claims found that Thomarios failed to require all prime contractors to provide written weekly status reports regarding completed and anticipated work, failed to attach the reports to the weekly meeting minutes, failed to provide a two-to-six-week look-ahead schedule at the weekly progress meetings, and failed to provide monthly progress reports. Brkich's trial testimony supports each of these findings.

{¶ 51} In fact, Brkich admitted that he did not realize the weekly status reports were not attached to the weekly meeting minutes until he was deposed in this case. He also admitted that Thomarios did not distribute the meeting minutes to the prime contractors within three days of the meeting as required by Section 2.2 of the original agreement. He stated that, in most cases, the minutes of the preceding weekly meeting were distributed at the start of the next meeting. Brkich agreed with MAC's counsel that "all the things that [MAC] said we're going to do and all the deficiencies that are holding us up that should have been in the minutes, never got into the minutes." (Tr. Vol. 3 at 718.) Brkich also acknowledged MAC was the only prime contractor on the project that provided him with written weekly status reports. *See* Section 6.6.1.

{¶ 52} In addition to the duties the CM owes to the prime contractors under Article 6 of the original agreement, Article 5 of the original agreement requires the following: "The formation of a cohesive, mutually beneficial partnering arrangement among the Contractor, all Separate Contractors, Contracting Authority, CM, A/E, and Owner will accomplish the construction of the Project most effectively and efficiently. This arrangement draws on their collective strengths, skills, and knowledge to achieve a Project of the intended quality, within budget, and on schedule. *To achieve that objective, participation in a partnering session is required for* [*the primary representative of the CM, A/E, owner and contractors*]." (Emphasis added.) (MAC's Ex. 2, Section 5.1.1.) Section 5.1.2 describes the purpose of the partnering session "is to build cooperative relationships between the Project's key stakeholders, avoid or minimize disputes, and nurture a more collaborative ethic characterized by trust, cooperation and teamwork."

(MAC's Ex. 2.)  Brkich testified the Zook Hall project was the first time he had acted as a project manager for a construction project employing multiple prime contractors.  Brkich agreed that coordination of the work of the prime contractors on such a project was essential to completing the project on time.  Brkich testified, however, "there was no partnering session," and "I don't know [why]."  (Tr. Vol. 3 at 714.)

{¶ 53} Trinetti testified the above cited deficiencies in Thomarios' performance delayed MAC's prosecution of the work.  Though we acknowledge the extent of delay arising from such deficiencies is difficult to quantify, the language of the original agreement setting forth the duties of the CM permits the inference that project delays will ensue if the CM fails to properly schedule and coordinate the work of the prime contractors.

{¶ 54} Thomas Cooke of Western Reserve Interiors ("WRI"), MAC's carpentry subcontractor, corroborated Trinetti's testimony that Thomarios was at fault for project delays.  Cooke testified the scope of WRI's work as MAC's subcontractor included installing metal wall studs, partitions and framing for interior walls, drywall taping and finishing, and installing acoustic ceiling tiles and sound insulation in the auditorium/lecture hall.  According to Cooke, WRI experienced delays on this project when he was told that the MEP contractor had completed certain activities such as mechanical and electrical rough-ins, including required inspections, only to arrive at the site to find that such activities had not been completed.  Because the MEP contractors' activities were predecessor activities to WRI's scope of work, WRI could not proceed.  Cooke blamed these issues on a lack of coordination by the CM.

{¶ 55} Cooke also blamed Thomarios for allowing other contractors to exhibit a "total disregard" for WRI's completed ceiling tile work in the auditorium.  (Tr. Vol. 3 at 665.)  According to Cooke, the CM blamed WRI for installing defective ceiling tiles when it was obvious that other contractors "basically ripped through the ceiling" to perform work that should have been completed earlier.  (Tr. Vol. 3 at 666.)  Cooke testified, in his opinion, Thomarios "didn't run the job" and coordination of the prime contractors "didn't happen." (Tr. Vol. 3 at 665, 667.)  When asked to explain his opinion, Cooke testified as follows:

> In the 40 years I've been in construction, and I've been on a
> multitude of projects, all kinds of projects, I've never been on
> a project that was run so poorly in my entire life.  Ever.  In
> every facet up and down the management stream, everything,

right on down to the contractors. I've never seen anything like it.

(Tr. Vol. 3 at 665.)

{¶ 56} Section 11.3.1 of the original agreement provides that the University may terminate MAC for cause if MAC "commits a *material breach* of the Contract including but not limited to * * * failure to prosecute the Work with the necessary force or in a timely manner." (Emphasis added.) (MAC's Ex. 2.) "At common law, a 'material breach' of contract is a party's failure to perform an element of the contract that is 'so fundamental to the contract' that the single failure to 'perform defeats the essential purpose of the contract or makes it impossible for the other party to perform.' " *O'Brien v. Ohio State Univ.*, 10th Dist. No. 06AP-946, 2007-Ohio-4833, ¶ 56, quoting 23 Williston, *Contracts*, Section 63:3 (4th Ed.1990). "The determination of whether a party's breach of a contract was a 'material breach' is generally a question of fact." *O'Brien* at ¶ 11. The reasoning behind this principle is that to determine whether a party's breach was material requires, inter alia, an examination of the parties' injuries, whether and how much the injured parties would or could have been compensated, and whether the parties acted in good faith. *Id.*, citing 23 Williston, *Contracts*, Section 63:3 (4th Ed.1990); E. Allan Farnsworth, *Contracts*, Sections 8.16-18, at 612 (1982). "All of these inquiries turn on subjective facts." *O'Brien* at ¶ 11. " '[A] "material" breach entitles a [party] to stop performing, which, in essence, terminates the contract.' " *Morton Bldgs., Inc. v. Correct Custom Drywall, Inc.*, 10th Dist. No. 06AP-851, 2007-Ohio-2788, ¶ 16, quoting *Nious v. Griffin Constr., Inc.*, 10th Dist. No. 03AP-980, 2004-Ohio-4103, ¶ 16.

{¶ 57} Based on the foregoing, we hold the weight of the evidence supports the finding that Stantec and/or Thomarios caused or contributed to the delay on the Zook Hall project. Because the evidence shows that much of the delay on the project was caused either by Stantec, Thomarios, or other prime contractors, the evidence supports the conclusion that the University did not have cause to terminate the original agreement.

### 2. Recovery Schedule

{¶ 58} Though the University focused on MAC's failure to provide a recovery schedule as a separate justification for terminating the original agreement, the Court of Claims found that, under the circumstances, the lack of a recovery schedule did not provide

the University with cause to terminate the original agreement.  We agree with the Court of Claims.

{¶ 59} As set out above, the 5-day notice was predicated on the reported fact that MAC was 83 days behind schedule.  The notice was also predicated on the fact that all 83 days of project delay were attributable to MAC.  Dougherty's testimony, if believed, shows that by the end of December, when the notice was issued, the project was just 10 days behind schedule.  Additionally, Trinetti testified the majority of the project delays were caused by Stantec, Thomarios, and/or other prime contractors, such as the MEP contractor, Didado.

{¶ 60} With regard to creating a recovery plan, Dougherty testified a well-designed recovery schedule is the first step in developing a recovery plan.  Dougherty observed, however, that during a January 7, 2016 meeting, other prime contractors, including Didado, resisted MAC's efforts to implement a recovery schedule.  Dougherty testified Didado's input was necessary to resolve the out-of-sequence activities in the existing schedule and to close the open-ended activities.  According to Dougherty, without incorporation of MAC's recommended changes to the project schedule, the recovery schedule could not be used to create a recovery plan.  The minutes from the January 7, 2016 meeting show that Thomarios' scheduling designer, Ted Whitcomb, did not even attend the January 7, 2016 meeting.  Consequently, MAC's recovery schedule was never implemented.

{¶ 61} Our independent review of the trial transcript and relevant exhibits reveals nothing which would cause this court to second guess the Court of Claims' assessment of the credibility and weight afforded the trial testimony of witnesses Trinetti and Dougherty.  Nor do we find any basis in the evidence to disagree with the assessment of the Court of Claims as to the credibility of these witnesses relative to the testimony of the University's witnesses who offered competing testimony.  Accordingly, we hold that the weight of the evidence supports the finding of the Court of Claims that, under the circumstances, MAC's failure/inability to produce a recovery plan did not constitute a material breach of the original agreement.

{¶ 62} This court has weighed the evidence and all reasonable inferences therefrom, considered the credibility of witnesses, and determined that, in resolving conflicts in the evidence, the Court of Claims did not clearly lose its way in finding the University breached

the original agreement with MAC. *Brown* ¶ at 19; *Eastley* at ¶ 20. Accordingly, we hold that the determination by the Court of Claims that the University terminated the original agreement for convenience, not for cause, is supported by sufficient evidence and not against the manifest weight of the evidence.

{¶ 63} As previously noted, Section 11.2.1 addresses termination for convenience and states "[t]he Contracting Authority may, at any time, terminate the Contract in whole or in part for the Owner's convenience and without cause, at any time upon 10 days' written notice to the Contractor." (MAC's Ex. 2.) Section 11.2.3 states, "[u]pon termination, the Contracting Authority shall pay the Contractor in accordance with the Schedule of Values for Work completed, including any retained funds, and the value of materials ordered and delivered, less any salvage credit the Contractor may receive for them." (MAC's Ex. 2.) According to Section 11.2.3.2, "[t]he Contractor is entitled to a fair and reasonable profit for Work performed and reasonable expenses directly attributable to termination of the contract." (MAC's Ex. 2.)

{¶ 64} Because the University terminated the original agreement for convenience rather than for cause, MAC was entitled to payment for all work completed, including any retained funds, as well as the value of materials ordered and delivered, less any salvage credit received. The University admits that it made no payments to MAC for the work completed or materials furnished in October, November, and December 2015. Thus, the evidence supports the conclusion that the University committed a material breach of the original agreement by failing to pay MAC.

{¶ 65} To the extent that the University's fifth assignment of error challenges the conclusion of the Court of Claims that the University breached the takeover agreement, the Court of Claims determined: "As for the takeover agreement, the Court finds the University had an obligation to pay the contract funds to Fidelity and that the University breached the takeover agreement in not paying Fidelity. The Court further finds that the state's failure to pay under the takeover agreement justified MAC's walk-off from the job site in May of 2016." (Decision at 26.)

{¶ 66} There is no dispute that the University stopped paying MAC after September 2015 and made no payments thereafter either to MAC or Fidelity. There is also no dispute that the University retained substantial contract funds following the execution of the

takeover agreement and refused to remit any of those funds to Fidelity or MAC, as Fidelity's designee, pursuant to the takeover agreement. (MAC's Ex. 8, Section 5, 8.) The University does not claim that MAC completed no work on the project under the takeover agreement. Thus, the failure of payment constitutes a material breach of the takeover agreement. Accordingly, the decision of the Court of Claims that the University breached the takeover agreement is supported by sufficient evidence and not against the manifest weight of the evidence.

{¶ 67} For the foregoing reasons, the University's fifth assignment of error is overruled.

### B. University's Sixth Assignment of Error

{¶ 68} In its sixth assignment of error, the University contends that certain language used by the Court of Claims in its decision evidences that the Court of Claims improperly placed the burden on the University to disprove MAC's breach of contract claim. We disagree.

{¶ 69} The burden is on the plaintiff in a breach of contract case to prove the elements of the claim by a preponderance of the evidence. *Farmers Mkt. Drive-In Shopping Ctrs., Inc. v. Magana*, 10th Dist. No. 06AP-532, 2007-Ohio-2653, ¶ 31. "Preponderance" is defined as "the greater weight of evidence." *Travelers' Ins. Co. v. Gath*, 118 Ohio St. 257, 261 (1928). The University points to the following language in the decision as evidencing the improper shifting of the burden of proof:

> In order to justify its termination of MAC and to obtain compensation the burden is on the University to prove that MAC was solely or substantially at fault for all the delays. The University has not met its burden of proof.

(Decision at 15.)

{¶ 70} When viewed in the context of this particular litigation, the above cited language merely evidences acknowledgment by the Court of Claims of the University's claim that MAC was solely and exclusively responsible for all delays to the project. The Court of Claims concluded that the evidence did not support the University's theory. As previously noted, the Court of Claims found the testimony of expert witness, Kelly, who supported the University's theory, was less credible and persuasive than the testimony of Trinetti and Dougherty.

{¶ 71} The above cited language may also be fairly read as a recognition by the Court of Claims that the University asserted competing breach of contract claims against MAC, for which the University had the burden of proof. Accordingly, we do not find that the language in the decision signals an improper shifting of the burden of proof.

{¶ 72} Moreover, this is not a case where the Court of Claims found the evidence of breach in equipoise. In other words, the allocation of the burden of proof was not the reason the Court of Claims ruled in favor of MAC on the breach of contract. Rather, the Court of Claims correctly determined that the greater weight of the evidence supported a finding that the delays in the project that precipitated MAC's termination were primarily attributable to others. Accordingly, we perceive no trial court error with regard to the burden of proof in this case.

{¶ 73} For the foregoing reasons, the University's sixth assignment of error is overruled.

### C. University's First Assignment of Error

{¶ 74} In its first assignment of error, the University contends that because MAC and the University were no longer in contractual privity following termination of the original agreement for cause, the Court of Claims erred when it awarded damages to MAC. We disagree.

{¶ 75} The first assignment of error is predicated on a determination by this court that the University terminated the original agreement for cause pursuant to Section 11.3.1. If this were the case, MAC would not be entitled to payment for the work completed prior to termination. *See* Section 11.3.5. Because we have determined the Court of Claims did not err when it concluded the termination of the original agreement was for convenience, MAC is entitled to be paid, pursuant to Section 11.2.3, for the work completed under the original agreement. Consequently, whether or not a termination of the original agreement for cause would have precluded MAC from recovering damages for the value of work performed under the takeover agreement is not an issue we need to resolve in this appeal.

{¶ 76} For the foregoing reasons, the first assignment of error is overruled.

### D. University's Second Assignment of Error

{¶ 77} In its second assignment of error, the University contends that MAC has no right to recover damages for the breach of the takeover agreement by way of an assignment from Fidelity. We disagree.

{¶ 78} MAC and Fidelity contend that Fidelity assigned to MAC all its contractual rights against the University under the takeover agreement. Thus, the question whether the Court of Claims erred in awarding damages to MAC as compensation for the University's breach of the takeover agreement depends on the validity of the assignment.

{¶ 79} "An assignment of contract rights is, itself, a contract, and thus, in order to establish an assignment, the elements of a contract must be present." *Hamrick v. Safe Auto Ins. Co.*, 10th Dist. No. 08AP-734, 2009-Ohio-1380, ¶ 15, citing *Zenfa Labs, Inc. v. Big Lots Stores, Inc.*, 10th Dist. No. 02AP-691, 2003-Ohio-628. "Those essential terms include mutual assent and consideration." *Hamrick* at ¶ 15, citing *Zenfa*, citing *Nilavar v. Osborn*, 127 Ohio App.3d 1 (2d Dist.1998). "In addition, a plaintiff alleging the existence of a contract must show that there was a meeting of the minds, and that the contract was definite as to its essential terms." *Hamrick* at ¶ 15, citing *Zenfa*, citing *Nilavar*.

{¶ 80} Walsh testified Fidelity assigned its claims against the University to MAC. The Court of Claims found that "[a]s this testimony is not in dispute and the University offered no evidence to rebut it, the Court finds that Fidelity assigned its rights under the takeover agreement to MAC and, therefore, MAC has the right to pursue claims and collect under both the original contract and takeover agreement." (Decision at 4.)

{¶ 81} The University contends that the elements of a valid contract of assignment are not present because Fidelity paid nothing to MAC or MAC's subcontractors for the work done on the project after MAC's termination. Both Walsh and Zumkehr testified, however, that for business reasons, MAC elected to assume Fidelity's obligation to pay its subcontractors when MAC began work under the takeover agreement. By doing so, MAC relieved Fidelity of its obligation to pay MAC and its subcontractors under the terms of both the surety bond and the takeover agreement. In return, Fidelity assigned its contractual rights to recover the remaining contract funds held by the University after MAC's termination. The Court of Claims determined the University breached the takeover agreement by failing to remit those funds to Fidelity or to MAC as Fidelity's designee.

{¶ 82} In our view, the elements of a contract of assignment have been established. Moreover, because Fidelity was made a party to this action, there will be no risk to the University of a separate lawsuit by Fidelity and no possibility of double recovery.

{¶ 83} The University argues the language of Section 12.13 in the original agreement barred Fidelity from assigning its rights against the University to MAC. We disagree.

{¶ 84} Though Section 12.13 of the original agreement does contain language arguably prohibiting assignment of the surety/contractor's rights under the takeover agreement, the Court of Claims made the following finding regarding the takeover agreement:

> [T]hough MAC did not complete the entire project, MAC substantially performed under the original contract and any failure to complete work after its walk-off in May of 201[6] was excused.
>
> * * *
>
> [T]he state's failure to pay under the takeover agreement justified MAC's walk-off from the job site in May of 2016. It is the Court's belief that the University had no intention to pay Fidelity after execution of the takeover agreement. In addition to the takeover agreement's plain language, MAC presented evidence, including the testimony of Mr. Walsh, that it was the expectation that the University would provide the contract funds after the execution of the agreement. * * *
>
> * * *
>
> * * * MAC substantially performed its obligations under the original contract, which was incorporated into the takeover agreement, and the University breached both the original contract and the takeover agreement. In addition, the project's delay resulted from concurrent causes including actions attributable to the University through Thomarios and/or Stantec. The University's failure to pay MAC for 8 months and failure to pay under the takeover agreement justified MAC's walk-off from the job in May of 2016.

(Decision at 25, 26, 28.)

{¶ 85} " 'The considerations in determining whether performance of a contract is substantial are those for determining whether a failure is material.' " *Huntington Natl. Bank v. Greer*, 3d Dist. No. 14-15-26, 2016-Ohio-5100, ¶ 43, quoting 18 Ohio Jurisprudence 3d, Contracts, Section 198, at 115-16 (2010); *see also In re Interstate Bakeries Corp.*, 751

F.3d 955, 962 (8th Cir.2014) ("Substantial performance and material breach are interrelated concepts."). As we have previously noted, a material breach will relieve the non-breaching party of its obligations under the contract. *Software Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App.3d 163, 170-71 (1st Dist.1990); *Morton Bldgs.*, 2007-Ohio-2788, at ¶ 16, quoting *Nious*, 2004-Ohio-4103, at ¶ 16 ("[A] 'material' breach entitles a [non-breaching party] to stop performing, which, in essence, terminates the contract."). Because the weight of the evidence supports the determination that MAC substantially performed the original agreement and because the University materially breached the takeover agreement by failing to make any payments thereunder, we hold that Fidelity was under no obligation to comply with the provisions in Section 12.13 in order to assert a claim under the takeover agreement. *Morton Bldgs.* at ¶ 16; *Nious* at ¶ 16. *See also J&H Reinforcing & Structural Erectors, Inc. v. Ohio School Facilities Comm.,* 10th Dist. No. 12AP-588, 2013-Ohio-3827, ¶ 126 ("once a party substantially performs its obligations under the contract, that party's breach of a term of the contract will not relieve the other party's performance obligation"). Similarly, given MAC's substantial performance under the original agreement and the University's complete and total failure of payment under the takeover agreement, we perceive no justifiable reason why Fidelity would be required to resort to the Article 8 process. *Id.*

{¶ 86} For the foregoing reasons, we hold the Court of Claims did not err when it awarded damages to MAC based on the assignment from Fidelity. Accordingly, the University's second assignment of error is overruled.

### E. University's Third Assignment of Error

{¶ 87} In its third assignment of error, the University argues the Court of Claims erred in awarding MAC damages for work it did not perform. More particularly, the University contends that by awarding MAC the full contract price, less sums previously paid, the Court of Claims must have paid MAC for certain alternatives that were included in the original contract price but were later removed from the project. The parties agree the price for alternatives G-1 and G-5 should be deducted from the contract price, but they disagree as to the amount of the deduction. We find the University has failed to establish the assigned error occurred.

{¶ 88} The amount of damages to be awarded in a breach of contract action is a factual issue and, thus, it " 'is within the jury's [or factfinder's] province to determine the amount of damages to be awarded.' " *Lill v. Ohio State Univ.*, 10th Dist. No. 17AP-733, 2019-Ohio-276, ¶ 27, quoting *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, ¶ 34. Accordingly, appellate courts review an award of damages in a bench trial under the manifest-weight-of-the-evidence standard. *Alternatives Unlimited-Special, Inc. v. Ohio Dept. of Edn.*, 10th Dist. No. 12AP-647, 2013-Ohio-3890, ¶ 35, citing *Scarberry v. Lawless*, 4th Dist. No. 09CA18, 2010-Ohio-3395, ¶ 43; *Johnson v. Waterville Gas & Oil Co.*, 6th Dist. No. L-08-1143, 2009-Ohio-4061, ¶ 20.

{¶ 89} As previously noted, the original agreement provides that on termination for convenience, Section 11.2.3 states "[u]pon termination, the Contracting Authority shall pay the Contractor in accordance with the Schedule of Values for Work completed, including any retained funds, and the value of materials ordered and delivered, less any salvage credit the Contractor may receive for them." (MAC's Ex. 2.) Section 11.2.3.2 limits the contractor's recovery as follows: "In no event shall the Contractor be entitled to (1) Contractor's Fee on Work not performed or (2) compensation in excess of the total Contract Sum." (MAC's Ex. 2.)

{¶ 90} The Court of Claims found that "MAC has proved beyond a reasonable certainty that it performed sufficient work and expended sufficient funds to entitle it to the contractual sum." (Decision at 30.) The Court of Claims noted that it was prohibited by Section 11.2.3.2 from awarding "compensation in excess of the total Contract Sum." (Decision at 30.) The Court of Claims did not mention the two alternatives and did not make any findings regarding the portion of damages it was awarding under the takeover agreement versus the original agreement. The Court of Claims noted only that MAC had an outstanding pay application of $1,200,000 for work performed prior to termination.

{¶ 91} The University has acknowledged that MAC submitted pay applications to the University prior to termination in the total amount of $1,455,998.11, including retainage, for work completed pursuant to "Pay App 10." (University's Ex. YYY.) We note that Exhibit 261, pay application 11, seeks $1,270,625.45 for work completed by MAC from November 1, 2015 to January 7, 2016. Though the Court of Claims made no specific determination of the value of the work completed by MAC subsequent to the termination

of the original agreement, the evidence shows, with the exception of the two weeks following termination of the original agreement, MAC's subcontractors remained on the job site and continued to complete work on the project over the next several months.

{¶ 92} "The burden of affirmatively demonstrating error on appeal rests with the [appellant]." *Miller v. Johnson & Angelo*, 10th Dist. No. 01AP-1210, 2002-Ohio-3681, ¶ 2; *see also* App.R. 9 and 16(A)(7). *See also State v. Sims*, 10th Dist. No. 14AP-1025, 2016-Ohio-4763, ¶ 11 (stating general rule that an appellant bears the burden of affirmatively demonstrating error on appeal). Pursuant to App.R. 16(A)(7), "[t]he appellant shall include in its brief, under the headings and in the order indicated, all the following: * * * An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, *and parts of the record on which appellant relies*." (Emphasis added.) "It is not the duty of this court to search the record for evidence to support an appellant's argument as to alleged error." *Abraham v. BP Exploration & Oil, Inc.*, 149 Ohio App.3d 471, 2002-Ohio-4392, ¶ 32 (10th Dist.).

{¶ 93} The record contains evidence that executed change orders to MAC totaled more than $150,000, thereby increasing the original contract price. Additionally, the record shows the amount of the deduction change order for alternatives G-1 and G-5 was disputed. MAC contends the amount of the deduction for the two alternatives was $293,782.28. (MAC's Ex. 259.) The University contends the appropriate deduction is $396,850. (University's Ex. NNN.)

{¶ 94} Trinetti testified MAC is not claiming damages for alternatives G-1 and G-5, and MAC's Exhibit 259 shows a deduction for alternatives G-1 and G-5. Contrary to the University's assertion, on this record, the mere fact that the Court of Claims awarded MAC damages equaling the original contract price does not necessarily mean that the Court of Claims awarded damages to MAC for performing work on the two alternatives. In our view, the University has not demonstrated the award of damages to MAC and/or Fidelity includes compensation for unperformed work on alternatives G-1 and G-5.

{¶ 95} Based on the foregoing, the University's third assignment of error is overruled.

**F.  University's Fourth Assignment of Error**

{¶ 96}  In its fourth assignment of error, the University contends the Court of Claims erred by not awarding damages to the University for breach of contract or deducting amounts from MAC's damages representing the work MAC left unfinished when it demobilized.  We disagree.

{¶ 97}  As set forth in our ruling on the University's fifth assignment of error, the Court of Claims did not err when it determined the University breached both the original agreement and the takeover agreement.  Having found in favor of MAC and Fidelity on the breach of contract claims, the Court of Claims made the following determination as to the University's counterclaim and third-party claim alleging breach of contract against MAC and Fidelity:

> MAC is entitled to judgment on the University's counterclaims and Fidelity is entitled to judgment on the University's third-party claims. As the Court has already found, MAC substantially performed its obligations under the original contract, which was incorporated into the takeover agreement, and the University breached both the original contract and the takeover agreement.  In addition, the project's delay resulted from concurrent causes including actions attributable to the University through Thomarios and/or Stantec.  The University's failure to pay MAC for 8 months and failure to pay under the takeover agreement justified MAC's walk-off from the job in May of 2016.  In sum, *having failed to perform its obligations under both contracts, a necessary element to any breach of contract claim, the University cannot recover for breach of contract.*

> The University also failed to present sufficient evidence that MAC failed to complete its work in a good and workmanlike manner and, therefore, its breach of warranty claim also fails. Though the University presented evidence of punch list items which required additional work after MAC left the job site in May of 2016, it did not establish that MAC performed shoddy work.  Rather, the University's evidence, at most, established that some work needed completed due to the University's own breach in terminating MAC and not paying it for 8 months which caused MAC to leave the job site.

(Emphasis added.)  (Decision at 28.)

{¶ 98}  Setoff, both at law and in equity, is that right that exists between two parties, each of whom under an independent contract owes a definite amount to the other, to set off

their respective debts by way of mutual deduction. *Triangle Properties v. Homewood Corp.*, 10th Dist. No. 12AP-933, 2013-Ohio-3926. The Supreme Court of Ohio has previously stated "the well established rule [is] that a setoff must have been a subsisting right at the time it is utilized." *Kocsorak v. Cleveland Trust Co.*, 151 Ohio St. 212 (1949). *See also Walter v. Natl. City Bank*, 42 Ohio St.2d 524 (1975); *Whitman v. South Side Bldg. & Loan Assn.*, 133 Ohio St. 560, 562 (1938) (for setoff to apply, each party must "owe[] a definite amount to the other"); *Frost v. Mihm*, 2d Dist. No. 95-CA-38 (Nov. 15, 1995) (a precondition of a right of setoff is that each party have the right to recover from the other); *Blackwell v. Internl. Union, United Auto Workers Local No. 1250*, 21 Ohio App.3d 110 (8th Dist.1984) (because defendant did not have an enforceable independent claim against plaintiff, setoff was inapplicable). Setoff is not strictly limited by statute, and the courts can allow setoff on equitable principles where necessary to prevent clear injustice. *Health Admrs. of Am., Inc. v. Am. Med. Security, Inc.*, 5th Dist. No. 00CAE04009 (Mar. 29, 2001).

{¶ 99} The Court of Claims made the following findings relative to the University's claim:

> The University seeks recovery for additional costs it incurred to complete and/or to remedy MAC's work. The court has found that MAC justifiably left the job site in May of 2016 and, therefore, was not in breach of either contract, in failing to complete some remaining work on the project. *The evidence established the University's ongoing failure to pay for work on the project and the continued delay resulting from problems with coordination and the schedule as well as the CCD and RFI process did not only justify MAC's walk-off; it also prevented MAC from completing its work.* * * * Thus, the University is not entitled to recover from MAC additional costs to complete the contract.

(Emphasis added.) (Decision at 31.)

{¶ 100} We have determined the Court of Claims did not err when it concluded the University breached the original agreement when it terminated MAC, without cause, but failed or refused to pay MAC for the work it completed prior to termination. We have also determined the Court of Claims did not err when it concluded the University breached the takeover agreement with Fidelity when it failed to remit the remaining contract funds to Fidelity after execution and thereafter failed or refused to make payment either to Fidelity

or MAC, as Fidelity's designee, for work completed by MAC pursuant to the takeover agreement.

{¶ 101} Because the conclusions reached by the Court of Claims are supported by sufficient evidence and not against the manifest weight of the evidence, the Court of Claims did not err when it entered judgment in favor of MAC and Fidelity as to the breach of contract claims set forth in the counterclaim and the third-party complaint. Having failed to establish an independent basis to recover from MAC and Fidelity, the University was not entitled either to damages or a setoff. *Triangle Properties.*

{¶ 102} For the foregoing reasons, the University's fourth assignment of error is overruled.

### G.  University's Seventh Assignment of Error

{¶ 103} In its seventh assignment of error, the University contends the trial court erred by not awarding it statutory delay damages. We disagree.

{¶ 104} Section 8.7.1 of the original agreement states in pertinent part:

> [I]t would be difficult, if not impossible, to determine the Owner's resulting damages. Therefore, if the Contractor fails to achieve a Milestone within the associated Contract Time, the Contractor shall (at the Owner's option) pay to or credit the Owner the Liquidated Damages per day sum determined according to the following schedule for each day that the Contractor fails to achieve a Milestone within the associated Contract Time.

(MAC's Ex. 2.)

{¶ 105} Because the original contract price was $5,137,700, Section 8.7.1 provided for $5,000 per day in liquidated damages.[6] The University's primary argument for statutory delay damages relates to the delays allegedly caused by MAC and its subcontractor, Glazing Systems, in failing to timely complete the north curtain wall addition. The University argues that because the north curtain wall addition was exclusively within MAC's scope of work, and because the completion of the north curtain

---

[6] R.C. 153.19 entitled "Contract shall contain provision as to time of completion," reads as follows: "All contracts under sections 153.01 to 153.60, inclusive, of the Revised Code, shall contain provision in regard to the time when the whole or any specified portion of work contemplated therein shall be completed and that for each day it shall be delayed beyond the time so named the contractor shall forfeit to the state a sum to be fixed in the contract, which shall be deducted from any payment due or to become due to the contractor."

wall addition was critical to permanent building enclosure, MAC's failure to complete the curtain wall until March 23, 2016 delayed the work of other prime contractors.[7]

{¶ 106} This court has previously stated that "if the party seeking to impose a liquidated damages clause can be deemed by his actions to have * * * contributed to an unreasonable delay, a liquidated damages clause is not available to him." *Mt. Olivet Baptist Church, Inc. v. Mid-State Builders*, 10th Dist. No. 84AP-373 (Oct. 31, 1985). As we have determined in ruling on the University's fifth assignment of error, much of the delay in completing the north curtain wall arose out of a dispute between MAC and Stantec regarding the alleged lack of detail in the project plans regarding the method of attaching the curtain wall to the existing structure. The Court of Claims found that "[n]either party convinced the Court that the other should bear sole blame for the curtain wall's delay * * *. [T]he evidence established that the parties attempted to resolve a good faith disagreement about work on the project through contractual procedures and that concurrent causes contributed to delay * * * the project." (Decision at 20-21.) As we have previously determined, the findings of the Court of Claims are supported by the greater weight of the evidence. Moreover, Trinetti testified CCD 79, providing the necessary detail for replacement of the missing steel support, was not fully executed until March 26, 2016. McNutt agreed that execution of CCD 79 and the work required thereunder were necessary to obtain permanent building enclosure. Consequently, the completion of the north curtain wall was not the only issue delaying permanent enclosure of Zook Hall.

{¶ 107} Based on the foregoing, we hold that the Court of Claims did not err when it ruled that liquidated damages were not available to the University under the facts of this case. The University's seventh assignment of error is overruled.

## IV. CONCLUSION

{¶ 108} Having overruled the University's seven assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

BROWN and BEATTY BLUNT, JJ., concur.

_____

---

[7] The University began assessing liquidated delay damages against MAC/Fidelity as of February 19, 2016.