[Cite as *D.D. v. B.B.*, 2022-Ohio-1032.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [D.D.], | : | |
| Petitioner-Appellee, | : | No. 20AP-509 |
| | | (C.P.C. No. 20DV-1653) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| [B.B.], | : | |
| Respondent-Appellant. | : | |

———————————

D E C I S I O N

Rendered on March 29, 2022

———————————

**On brief:** *Capital University Law School Family Advocacy Clinic*, and *Daniel P. Nunner*, for appellee. **Argued:** *Daniel P. Nunner*.

**On brief:** *Colin Peters Law, LLC* and *Colin E. Peters*, for appellant. **Argued:** *Colin E. Peters*.

———————————

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

SADLER, J.

{¶ 1} Respondent-appellant, B.B., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting the petition for a domestic violence civil protection order ("DVCPO") filed by petitioner-appellee, D.D. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} At the time of the events relevant to this appeal, appellant and appellee had been in an "off and on" relationship for approximately 14 years. (Tr. at 26.) They have a child, B.J., who was 8 years old at the time of the incident resulting in the DVCPO.

Appellant was B.J.'s custodial parent for purposes of school placement and there was a shared parenting plan.

{¶ 3} Appellee filed a petition for a DVCPO on September 18, 2020, alleging appellant assaulted her on September 15, 2020. In the petition, appellee claimed appellant forcibly grabbed her by the hair, dragged her into the kitchen and slammed her against a refrigerator, then threw her outside, kicked her, and threw her down the steps. Appellee further alleged there had been "many instances of physical violence in the past." (Addendum to Am. Petition) Appellee asserted she was "in imminent fear of serious physical harm" from appellant and requested a DVCPO to protect herself and B.J. (Addendum to Am. Petition) The trial court granted an ex parte DVCPO the day appellee filed her petition.

{¶ 4} The trial court conducted a full evidentiary hearing on the petition on October 1, 2020. Appellee testified that on September 15, 2020, she took B.J. to the home of appellant's mother, where appellant also lived, so B.J. could attend online school. At some point after dropping B.J. off, appellee spoke with him by phone; B.J. was crying and upset, but appellant hung up the phone. Appellee testified she called back repeatedly, and appellant did not answer the phone. Appellee and her mother, N.D-H., then drove to pick up B.J. N.D-H. waited in the car while appellee went into the house to get B.J.; appellant's niece let appellee into the house. Appellee walked through kitchen and living room into the "study room," where B.J. was performing schoolwork. (Tr. at 29.)

{¶ 5} Appellee testified that when she entered the study room, appellant began screaming at her:

> And instantly [appellant] just started screaming at me, Bitch, why the fuck are you here? Get the fuck out of my house. Why the fuck do you keep calling my phone? And just started screaming at me.

(Tr. at 29.) Appellee told B.J. to pack his things so they could leave; appellant responded "[h]e's not going anywhere, but you can get the fuck out." (Tr. at 29.) Appellee stated she would not leave without B.J. Appellant then "started grabbing [appellee] up and throwing [her] around the house to push [her] out the door." (Tr. at 30.) Appellee testified she tried to grab a table as appellant pushed her through the kitchen. Appellant then "slamm[ed] [appellee] into the refrigerator, [and] thr[ew] [her] outside." (Tr. at 30.) Appellee testified

the right side of her face struck the refrigerator. Appellant then "came outside, threw [appellee] down the steps, and kicked [her]." (Tr. at 30.) Appellee claimed that her socks and shoes came off at some point during the altercation. As she fell down the steps, the lower half of appellee's body scraped the ground, leaving "the skin on the top part of [her] feet and [her] toenails" scraped. (Tr. at 31.) When appellee landed, appellant kicked her but she "hopped back up and tried to run into the house" to get to B.J. (Tr. at 31.) N.D-H. and appellant's sister, J.B., ran up and told appellant to stop. Appellee testified both appellant and J.B. held her back when she was trying to get to B.J.

{¶ 6} N.D-H. testified she was waiting in the car while appellee went into appellant's house to pick up B.J. While she was waiting, N.D-H. saw the back door open and then saw appellant "throwing [appellee] down the steps and * * * stomping on her." (Tr. at 81.) N.D-H. called 911 and approached the house. She testified that "[appellant's] foot was in the air and he was about to come down again," but stopped when he saw N.D-H. approaching. (Tr. at 82.)

{¶ 7} Appellee admitted she declined medical assistance from the responding police officers. Appellee testified she had diabetes, which caused a delay in her injuries becoming visible. Appellee took several photographs in the days after the incident to document those injuries. Copies of photographs purporting to show scabs on appellee's elbow and feet, and swelling around her eyes, were introduced at the hearing.

{¶ 8} Both appellee and N.D-H. testified appellant previously had struck appellee. Appellee testified there was an incident in 2018 that led to criminal charges against appellant but claimed she "lost the trial." (Tr. at 41.) Appellee claimed she was scared on September 15, 2020, because "no matter how many times [appellant] put his hands on me in the past, he never did it in front of our son." (Tr. at 40.)

{¶ 9} Appellant's sister, J.B., testified that in September of 2020, she lived at her mother's home, along with her stepfather, her three children, appellant, and B.J. On September 15, 2020, she was outside the home, sitting in her car, when appellee and N.D-H. arrived. J.B. was not surprised to see appellee arrive, noting appellee "had been coming over, like, every day for, like, the past four days prior to that." (Tr. at 101.) Fifteen to twenty minutes later, J.B. saw appellant carry appellee out to the porch, holding appellee under her arms. Appellee was "fighting and kicking and screaming," and J.B. heard appellant say

"[b]itch, get out my house." (Tr. at 102.) J.B. went to the porch and tried to pull appellee away from the house. Appellee was yelling that she wanted B.J., so J.B. went in the house to help him gather his things. J.B. denied seeing appellant throw appellee down the stairs or kick her. J.B. claimed appellee stumbled at one point but did not hit the ground. J.B. did not see the interaction between appellee and appellant that occurred inside the house.

{¶ 10} Appellant testified he was helping B.J. with a school reading assessment when appellee called; he claimed he told her they would call her back after the assessment. Appellant admitted appellee called several more times but claimed he did not hear those calls because the ringer on his phone was turned off. Appellant testified he did not know appellee had come to his house and was confused when appellee walked into the study room. Appellant told appellee to wait outside while B.J. finished the reading assessment, but appellee refused. Appellant testified he asked appellee to leave several times, but she repeatedly refused. Appellant told B.J. to go get dressed; after B.J. left the room, appellant took out his phone and began to call the police because appellee would not leave. Appellant claimed appellee then picked up the charger for B.J.'s laptop and struck appellant in the head with it. He alleged appellee also pushed his mother's laptop computer off a table onto the floor. Appellant testified he then grabbed appellee and walked toward the back door. When they reached the kitchen, he released appellee. Appellant testified that appellee grabbed a glass-topped table and tried to flip it over. Appellant grabbed appellee and carried her out the back door. Appellant testified that once they were out the door, appellee was holding onto his shirt but J.B. and N.D-H. pulled appellee away. Appellant returned into the house, closed the door, and called police.

{¶ 11} Appellant denied smashing appellee's face into the refrigerator, claiming it was "impossible" for her head to strike something because of the way he was carrying her. (Tr. at 146.) Appellant also denied throwing appellee down the back steps or kicking her. Appellant claimed he physically removed appellee from the house to prevent her from damaging property, including laptop computers in the study room.

{¶ 12} Appellant admitted he had been charged with domestic violence against appellee in 2018. The case went to trial, but the charge was dismissed under Crim.R. 29. Appellant denied ever hitting appellee on any occasion, testifying he "never struck at [appellee] in my life." (Tr. at 136.)

{¶ 13} Columbus Police Officer Anthony Parks and his partner, Officer Goodwin, responded to the 911 calls. Officer Goodwin interviewed appellee, while Officer Parks interviewed appellant. Appellant told Officer Parks that appellee struck him on the head with a cord or charger and kicked and punched at him when he tried to remove her from the house. Appellee told Officer Goodwin that appellant dragged her through the house, threw her down the back steps, and kicked her. Officer Goodwin noted appellee was limping slightly, but Officer Parks did not observe any visible injuries to appellee or appellant. Officer Parks also noted appellant and appellee's clothes were not dirty or messed up. Officer Parks did not arrest or file charges against either appellant or appellee; he testified he felt there was insufficient evidence to support an arrest or charge.

{¶ 14} The trial court found appellee was placed in "imminent fear of physical harm by the threats and/or actions of [appellant] and that the fear was objectively reasonable given the circumstances." (Tr. at 154.) The court further found appellee was in danger of or had been a victim of domestic violence and that a DVCPO was equitable, fair, and necessary to protect appellee from domestic violence. The court issued the DVCPO on October 1, 2020, for a term of two and one-half years. The court declined to apply the DVCPO to B.J. and the order expressly provided it did not affect any orders issued in the parties' custody case.

{¶ 15} Appellant timely appealed the judgment entry issuing the DVCPO.

## II.  ASSIGNMENTS OF ERROR

{¶ 16} Appellant assigns the following as trial court error:

> [1.] The trial court erred by granting [Appellee] a Protection Order based on insufficient evidence and against the manifest weight of the evidence.
>
> [2.] The trial court erred by finding that Appellee's fear of domestic violence was objectively reasonable.
>
> [3.] The trial court erred by finding that Appellant's action in defense of property was unreasonable.

## III.  LEGAL ANALYSIS

{¶ 17} In his first assignment of error, appellant argues granting the DVCPO was against the manifest weight of the evidence.[1] In his second assignment of error, appellant

---

[1] Appellant's first assignment of error also purports to challenge the sufficiency of the evidence, but his argument focuses solely on the credibility of the evidence presented to the trial court. When evaluating the

argues the trial court erred by finding appellee had an objectively reasonable fear of domestic violence. Because finding that appellee had an objectively reasonable fear was necessary for granting the DVCPO, these assignments of error are interrelated; we will address them together.

{¶ 18} "Pursuant to R.C. 3113.31, a person who is subject to domestic violence may petition a court for a [civil protection order]." *Peterson v. Butikofer*, 10th Dist. No. 18AP-364, 2019-Ohio-2456, ¶ 23. "[T]he petitioner must prove by a preponderance of the evidence that the petitioner, petitioner's family, or petitioner's household members are in danger of domestic violence." *Id.*, citing *Felton v. Felton*, 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. Under the statute, "domestic violence" includes "[p]lacing another person by the threat of force in fear of imminent serious physical harm." R.C. 3113.31(A)(1)(a)(ii).

{¶ 19} "An appellate court reviews a trial court's granting of a [civil protection order] to ' "determine whether sufficient, credible evidence supports a finding that the respondent had engaged in acts or threats of domestic violence." ' " *Peterson* at ¶ 39, quoting *Fleckner v. Fleckner*, 177 Ohio App.3d 706, 2008-Ohio-4000, ¶ 15 (10th Dist.), quoting *Kabeer v. Purakaloth*, 10th Dist. No. 05AP-1122, 2006-Ohio-3584, ¶ 7. "[W]e will not reverse the

---

sufficiency of the evidence in a civil case we do not consider the credibility of the evidence. *Sutherland v. Gaylor*, 10th Dist. No. 20AP-257, 2021-Ohio-1941, ¶ 43 ("[N]either the weight of the evidence nor the credibility of the witnesses is considered in conducting a sufficiency of the evidence review."). Rather, we must determine whether the evidence, construed most strongly in favor of the prevailing party, was legally sufficient to support the judgment. *Id.* at ¶ 31. Under his first assignment of error, appellant has not presented any argument that the evidence presented at the hearing, if construed most strongly in favor of appellee, was not legally sufficient to support the issuance of a DVCPO. Accordingly, our analysis focuses solely on whether the manifest weight of the evidence supported the judgment granting the DVCPO.

The dissent suggests we have improperly failed to separately consider the sufficiency of the evidence. As the dissent correctly notes, "[a]s a general rule, 'courts of appeal decide appeals on assignments of error, not arguments or issues contained in a brief.' " *Mid Am. Constr., LLC v. Univ. of Akron*, 10th Dist. No. 18AP-846, 2019-Ohio-3863, ¶ 23, quoting *Wood v. Simmers*, 10th Dist. No. 17AP-269, 2017-Ohio-8178, ¶ 7. In *Mid American*, the appellant presented arguments in its brief that did not relate to the corresponding assignment of error. *Id.* By contrast, in the present case we are presented with the converse scenario — appellant challenged the sufficiency of the evidence in his first assignment of error but failed to provide any supporting argument in his brief related to the sufficiency of the evidence. App.R. 12(A)(2) expressly provides that we may "disregard an assignment of error presented for review if the party raising it * * * fails to argue the assignment separately in the brief, as required under App.R. 16(A)." Further, our conclusion that the trial court's judgment was not against the manifest weight of the evidence necessarily requires us to find that appellee established all the required elements for a DVCPO — i.e., the evidence presented was sufficient to support the judgment. *In re L.B.*, 10th Dist. No. 19AP-644, 2020-Ohio-3045, ¶ 29, quoting *In re C.N.*, 10th Dist. No. 15AP-67, 2015-Ohio-2546, ¶ 9. (" '[A] finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment.' ")

trial court's granting of the [civil protection order] as being against the manifest weight of the evidence so long as some competent, credible evidence goes to the essential elements of the case." *Id.* "[I]f the evidence is susceptible to more than one interpretation, [we] must construe the evidence consistently with the trial court's judgment." *Peterson* at ¶ 39.

{¶ 20} Appellee alleged she was in "imminent fear of serious physical harm." (Addendum to Am. Petition) To obtain a DVCPO on that basis, "appellee was required to prove, by a preponderance of the evidence, that appellant placed her, by threat of force, in fear of imminent serious physical harm." *Fleckner* at ¶ 17. "[W]e have imposed both a subjective test, which inquires whether the respondent's threat of force actually caused the petitioner to fear imminent serious physical harm, and an objective test, which inquires whether the petitioner's fear is reasonable under the circumstances." *Id.* at ¶ 23.

{¶ 21} "Force" is not defined in R.C. Chapter 3113, but we have applied the definition of the term under R.C. Chapter 2901 in DVCPO cases. *Id.* at ¶ 19. Under that definition, "force" is "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶ 22} It is undisputed that appellant forcibly removed appellee from his mother's house on September 15, 2020. Appellant admitted to picking up appellee and carrying her out of the house, although he argued he used reasonable force in removing appellee to protect himself and the family's property. The question before us on appeal is whether there was competent, credible evidence that appellant placed appellee in fear of imminent serious physical harm by threat of force.

{¶ 23} We have previously held that a threat of force for purposes of R.C. 3113.31 is not limited to an express verbal threat. *See Fleckner* at ¶ 26 ("[S]evere physical and verbal intimidation may be sufficient to implicitly present a threat of force.").[2] In this case, appellant did not make any specific verbal threats toward appellee, but called her "[b]itch," asked "why the fuck are you here," and told appellee to "[g]et the fuck out of my house."

---

[2] Similarly, Ohio courts have held that for purposes of R.C. 2919.25, defining the criminal offense of domestic violence, a "threat of force" is not limited to a specific verbal threat. *See State v. Marshall*, 12th Dist. No. CA2016-11-031, 2017-Ohio-9269, ¶ 22 ("[N]onverbal conduct can establish a threat of force if the defendant acted knowingly and the conduct caused the victim to anticipate imminent physical harm."); *see also State v. Bilyk*, 5th Dist. No. 17-CA-79, 2018-Ohio-1802, ¶ 15 (adopting the holding in *Marshall*); *State v. Cooper*, 11th Dist. No. 2019-A-0090, 2020-Ohio-3559, ¶ 25 ("Contrary to Cooper's argument, there is nothing in R.C. 2919.25(C) limiting the threat of force to specific verbal threats.").

(Tr. at 29.) Appellee testified that appellant "just started screaming at" her when she entered the study room. (Tr. at 29.) These statements by appellant were accompanied by the use of force. Appellee testified that while "grabbing [her] up and throwing [her] around the house to push [her] out the door," appellant "slamm[ed] [her] into the refrigerator." (Tr. at 30.) Appellant then pushed appellee out of the house, "threw [her] down the steps, and kicked [her]." (Tr. at 30.) N.D-H., who was waiting in her car nearby, saw appellant "stomping on [appellee] and her hanging onto the steps." (Tr. at 80.) Under these circumstances, appellant's aggressive verbal statements, accompanied by his use of physical force, was the type of "severe physical and verbal intimidation" that may constitute a threat of force. *See Fleckner* at ¶ 26. The testimony of appellee and N.D-H., therefore, was competent, credible evidence supporting the trial court's conclusion that appellant made a threat of force against appellee.

{¶ 24} Next, we must determine whether there was competent, credible evidence that the threat of force "caused [appellee] to fear imminent serious physical harm, and * * * whether [her] fear [was] reasonable under the circumstances." *Id.* at ¶ 23.

{¶ 25} "Serious physical harm" is not defined in R.C. Chapter 3113, but we have applied the definition of the phrase under R.C. Chapter 2901 in DVCPO cases. *Id.* at ¶ 19. "Serious physical harm" includes any physical harm carrying a substantial risk of death, involving permanent incapacity or temporary substantial incapacity, permanent disfigurement or temporary serious disfigurement, or acute pain of such duration as to result in substantial suffering or any degree of prolonged or intractable pain. R.C. 2901.01(A)(5)(b) through (e). We have held that "imminent" means " 'ready to take place,' 'near at hand,' 'impending,' 'hanging threateningly over one's head,' or 'menacingly near.' " *Fleckner* at ¶ 20, quoting *Webster's Third New International Dictionary* 1130 (1969).

{¶ 26} Appellee testified she was scared during the altercation on September 15, 2020, because appellant previously had not been physically abusive in front of B.J.:

> Q. [Appellee], how did you feel during this incident?
>
> A. Scared. He's never -- no matter how many times he put his hands on me in the past, he never did it in front of our son.
>
> Q. Okay.

> A. He's never called me out of my name -- he usually, like,
> whispers it in my ear or pulls me into another room. For him
> to do it directly in front of B.J. and then just B.J., the way he --
> I could hear my baby's screams in my ear.

(Tr. at 40.) Regarding her injuries, appellee testified the right side of her face struck the refrigerator when appellant "slamm[ed]" her into it while pushing her through the kitchen. (Tr. at 30.) Further, appellee felt "excruciating pain in [her] side" after appellant threw her down the stairs and kicked her. (Tr. at 54.) N.D-H. described the kick as appellant "stomping" on appellee and claimed she saw appellant raise his foot to strike again but stop when he saw her. (Tr. at 80, 82.)

{¶ 27} " 'The reasonableness of [a petitioner's] fear should be determined with reference to the history between the petitioner and the respondent.' " *Fleckner* at ¶ 21, quoting *Gatt v. Gatt*, 9th Dist. No. 3217-M (Apr. 17, 2002). Both appellee and N.D-H. claimed appellant had struck appellee on prior occasions. Appellee characterized this as "pops in the head," an open-handed "smacking in the head" or "pop in the face," or "little jabs like this on the leg." (Tr. at 41-42.) Appellee's description of the force appellant used on September 15, 2020, combined with her testimony that appellant had not previously struck her in front of B.J., suggests the altercation was more severe than prior incidents. Regarding her attempt to go back into the house after being shoved out the door and down the steps, appellee explained:

> I do know I was trying to get my baby out of the house because
> if they would have locked him in there -- it's happened in the
> past -- the police can't do anything, and he would have been
> stuck there and I couldn't have did anything.

(Tr. at 33.) Appellee explained further on cross-examination:

> B.J. had packed up all his school things by then and was trying
> to get out the door, but they weren't letting him; and I was
> trying to get through the door to pull my son out the door.

(Tr. at 55.) This testimony suggests appellee tried to go back into the house to get B.J. *despite* the risk of physical harm from appellant.

{¶ 28} Appellant primarily asserts that the testimony from appellee and N.D-H. was not credible, arguing that Officer Parks did not observe any injuries to appellee and that the photographs purporting to document appellee's injuries were taken long after the incident.

Appellant claims his testimony was more credible, arguing he physically removed appellee from the home in a reasonable manner to protect himself and prevent property damage.

{¶ 29} The trial court considered the credibility of appellant and appellee, stating the case was "probably the most difficult case I've had to weigh credibility of both witnesses." (Tr. at 153.) The court acknowledged appellant "may not have intended to do anything," but ultimately concluded he placed appellee "in fear of serious physical harm or danger." (Tr. at 154.) The trial court further concluded appellee's fear was objectively reasonable under the circumstances. Based on the record before us, giving appropriate deference to the trial court's credibility assessment, the judgment was not against the manifest weight of the evidence because appellee presented competent, credible evidence as to each element required for a DVCPO. *See Strassell v. Chapman*, 10th Dist. No. 09AP-793, 2010-Ohio-4376, ¶ 11-28 (concluding evidence was sufficient to support issuance of civil protection order and trial court made permissible inferences to conclude petitioner had a reasonable fear of imminent serious physical harm); *Johnson v. Auls*, 10th Dist. No. 08AP-286, 2008-Ohio-6123, ¶ 18-19 (finding record contained competent, credible evidence to support issuance of civil protection order where "the trial court was presented with two different versions of the relationship between the parties and expressly found [petitioner's] version to be credible").

{¶ 30} Accordingly, we overrule appellant's first and second assignments of error.

{¶ 31} In his third assignment of error, appellant claims the trial court erred by finding that his use of force in defense of property was not reasonable. On cross-examination at the hearing, appellant claimed he used reasonable force to protect his family's property:

> Q. Okay. You said you used reasonable force to get [appellee] out of your house?
>
> A. Yes.
>
> Q. When you started to use that reasonable force at what -- why wouldn't you just relent at any point? She stopped hitting you with the charger. Why did you still feel threatened to use reasonable force?
>
> A. Well, the reason why I used reasonable force is because she damaged my mom's $1,000 laptop; and I was trying to protect my mom's stuff. Because I don't -- I've only been living there for about two months. So I didn't want her to damage my

> mom's belongings and my dad's belongings because all of their stuff was there.
>
> Also, my nieces and nephews, all their laptop -- this is the study room. So all of their laptops are in front of their chair. They're stacked up around the table. So when she's shoving and kicking the table, all those laptops are falling. And when those laptops are damaged, we have to pay for it. My mom has to pay for that stuff. My sister would have to -- you know, we have to pay for that suff.
>
> When she hit me, I was trying to stop her from continuously breaking things in my mom's home.

(Tr. at 147-48.) In granting the DVCPO, the trial court stated appellant "probably shouldn't have put [his] hands on [appellee]," and "weighing injury to parties as opposed to damage to property, it weighs in [appellee's] favor." (Tr. at 153.)

{¶ 32} This court has held that when asserting the affirmative defense of defense of property, "a defendant must 'present evidence that he reasonably believed that his conduct was necessary to defend his property against the imminent use of unlawful force, and the force used was not likely to cause death or great bodily harm.' " *State v. Moses*, 10th Dist. No. 13AP-816, 2014-Ohio-1748, ¶ 41, quoting *State v. Bruckner*, 8th Dist. No. 63296 (Sept. 30, 1993). Citing *Moses*, appellant argues that, as a matter of law, he could defend his property by force so long as that force was not likely to cause death or great bodily harm. However, appellant also "concedes that such force may become unreasonable if it causes injury to another." (Appellant's Brief at 22.)

{¶ 33} Ohio courts have long recognized that the amount of force that is reasonable in defense of property depends on the circumstances. In an early decision, the Supreme Court of Ohio held that "in defense of possessions, an assault, by the gently laying on of hands, is justifiable, but not a battery, except it result from resistance and violence." *Likes v. Van Dike*, 17 Ohio 454, 456 (1848). Nearly a century later, in a case involving the use of spring guns to protect land farmed for produce, the Supreme Court expressly recognized that reasonable force could be used to defend property, holding that "a person has the right to protect his property from a trespass, and, after warning or notice to the trespasser, use such force as is *reasonably* necessary so to do." (Emphasis added.) *State v. Childers*, 133 Ohio St. 508, 516 (1938). *See also Allison v. Fiscus*, 156 Ohio St. 120, 129 (1951) ("One sure legal principle is that the owner of property is entitled to use as much force as is reasonably

necessary to protect it from those who would feloniously steal it."); *Id.* at 130 (Taft, J., dissenting.) ("It is elementary that a defendant, who relies upon the defense of his property as a justification for an assault must allege that the force which he used was no more than reasonably necessary to protect his property.").

{¶ 34} Consistent with these principles, this court has held that a defendant was not entitled to a jury instruction on defense of property where he used an unreasonable amount of force by clubbing an 11-year-old boy in the head with a handgun in response to the boy leaning or sitting on and kicking the defendant's car. *State v. Stepp*, 10th Dist. No. 93APA10-1488 (Nov. 17, 1994). Other decisions from this court and other Ohio appellate courts have similarly acknowledged that only reasonable force may be used in defense of property. *See State v. Behnfeldt*, 5th Dist. No. 2020CA00105, 2021-Ohio-1915, ¶ 19 (discussing common law right to use reasonable force to eject a trespasser from property); *State v. White*, 2d Dist. No. 23816, 2010-Ohio-4537, ¶ 35 ("Defense of property, or defense of ejectment, is akin to self-defense. A property owner may eject a trespasser by the use of reasonable force after the trespasser has received notice to depart and fails to do so within a reasonable time.") (Citation omitted.); *State v. Lefevre*, 10th Dist. No. 94APA09-1376 (May 4, 1995) ("A person may use force to protect his property and eject a trespasser so long as the force used is reasonable under the circumstances.").

{¶ 35} Whether construed as defense of property or removal of a trespasser, the question of whether the force used was reasonable is an issue of fact. *See Behnfeldt* at ¶ 19, quoting *State v. Ashworth*, 11th Dist. No. 99-P-0094 (Feb. 23, 2001), fn. 4 (" 'What constitutes reasonable force to eject is a question for the trier of fact.' "); *State v. Pedro*, 7th Dist. No. 11-MA-128, 2012-Ohio-3674, ¶ 27 ("What constitutes reasonable force to eject is a question for the trier of fact."). This case largely turned on the testimony of appellant and appellee; the trial court was required to determine their credibility in evaluating that testimony.[3] "[I]t is well-established that a trial court, particularly a domestic relations

---

[3] The dissent asserts the evidence was undisputed that appellant used force to remove appellee from the home and that appellee resisted being removed. "Disputed" facts are often subject to differing interpretations. For example, appellee admitted she grabbed the kitchen table, but claimed it was in an effort "to stop [appellant] from throwing me around." (Tr. at 53.) By contrast, appellant claimed he had released appellee after carrying her into the kitchen and that she grabbed the table and "tried to flip it over." (Tr. at 146.) "If evidence is susceptible of more than one construction, a reviewing court must give it the interpretation that is consistent with the verdict and judgment." *State v. Horton*, 10th Dist. No. 14AP-997, 2015-Ohio-4039, ¶ 25.

court, is in the best position to resolve disputes of fact, and assess the 'credibility of witnesses' and the weight to be given to their testimony." *Bates v. Bates*, 10th Dist. No. 04AP-137, 2005-Ohio-3374, ¶ 38, quoting *Tonti v. Tonti*, 10th Dist. No. 03AP-494, 2004-Ohio-2529, ¶ 109. In evaluating testimony, a factfinder "is free to believe all, part, or none of the testimony of each witness before it." *State v. Horton*, 10th Dist. No. 14AP-997, 2015-Ohio-4039, ¶ 25. "[A]n appellate court 'may not substitute its judgment for that of the trier of fact on the issue of credibility of the witnesses unless it is patently apparent that the factfinder lost its way.' " *State v. Williams*, 10th Dist. No. 10AP-779, 2011-Ohio-4760, ¶ 21, quoting *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, ¶ 81 (2d Dist.). By granting the DVCPO in this case, the trial court rejected appellant's defense of property claim, implicitly finding that the force appellant used to remove appellee from the house was not reasonable.[4] Based on the evidence presented at the hearing, including appellee's testimony that appellant slammed her head into the refrigerator, threw her down the steps, and kicked her, we cannot conclude the trial court erred in making that determination.[5]

---

[4] The dissent suggests the trial court erred because it "failed to consider appellee's status as a trespasser." We agree that the trial court "never use[d] the words 'trespass' or 'trespasser' " in announcing its decision but note that appellant himself did not raise such an argument in either the trial court or here on appeal. At the hearing, appellant consistently described his use of force to remove appellee as defense of property or self-defense but never claimed appellee was a trespasser, notwithstanding his testimony that he demanded she leave the house. Appellant testified he told the responding officers that he "used reasonable force to remove [appellee] from [his] mom's home because she hit me in the head with a charger and she was attempting to damage some things in [his] mom's home." (Tr. at 135.) Likewise, in describing the altercation, appellant testified "[s]o when she shoved [the laptop] on the ground and she hit me with [the charger], that's when I grabbed her and I proceeded to, you know, use reasonable force to get her out of my mom's house *because I didn't want her to damage anything else*." (Emphasis added.) (Tr. at 132-33.) Moreover, on appeal, appellant continues to characterize his actions as defense of property or self-defense but does not argue appellee was a trespasser, and appellant claimed he was "permitted to use force not likely to cause death or great bodily harm in defense of property" and argued "his actions in defending his home and himself were legal." (Appellant's Brief at 22.) Thus, the dissent sua sponte raises this issue for the first time on appeal and effectively argues the trial court should have considered whether it constituted an affirmative defense to appellee's DVCPO petition despite appellant's failure to assert such a defense.

Contrary to the dissent's assertion, this appeal does not involve the question of whether a homeowner must "choose between suffering a continuing trespass and subjecting himself to a DVCPO." Appellant clearly presented his claim that he used reasonable force to remove appellee from the home to defend himself and his family's property; appellant and his trial counsel used the term "reasonable" no fewer than six times during appellant's testimony to describe the amount of force employed against appellee. Because it granted the DVCPO, the trial court necessarily must have concluded that appellant used an unreasonable amount of force in removing appellee. Thus, the question before us on appeal is whether the trial court properly rejected appellant's claim that he used reasonable force. As explained above, in considering that question we must give appropriate deference to the trial court's credibility determination.

[5] Appellee cites a Fifth District Court of Appeals decision reasoning that "[t]he intent of the statute [criminalizing domestic violence] could be abrogated entirely by utilization of the defense of property unless

*See Halcomb v. Greenwood*, 12th Dist. No. CA2018-03-008, 2019-Ohio-194, ¶ 40 ("Because the domestic relations court is best suited to assess Greenwood's credibility and the weight to be given to his testimony, we decline Halcomb's invitation to substitute our judgment for that of the domestic relations court concerning Greenwood's credibility or the weight to be afforded to Greenwood's testimony.").

{¶ 36} Accordingly, we overrule appellant's third assignment of error.

## IV. CONCLUSION

{¶ 37} For the foregoing reasons, we overrule appellant's three assignments of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

MENTEL, J., concurs.
JAMISON, J. dissents.

————————————

clearly warranted as it is obvious that such would be claimed in virtually every case with the burden of establishing lack of ownership by the State often unlikely or impossible." *State v. Varney*, 5th Dist. No. 04-COA-028, 2005-Ohio-1752, ¶ 17. Appellee argues that permitting a respondent in a DVCPO proceeding to assert defense of property would "abrogate the important purpose of a Civil Protection Order." (Appellee's Brief at 19.) Because we conclude the trial court did not err by concluding appellant did not use reasonable force in this case, we need not reach the question of whether it is appropriate to restrict the application of defense of property in DVCPO cases.

Jamison, J., dissenting.

{¶ 38} I would find that the trial court erred, as a matter of law, when it granted appellee's petition for a DVCPO, as the ruling was not supported by sufficient evidence in the record. Appellant is effectively left with Morton's Fork. Morton's Fork is an expression that describes a choice between two equally unpleasant alternatives (in other words, a dilemma), or two lines of reasoning that lead to the same unpleasant conclusion. It is analogous to the expressions "*between the devil and the deep blue sea*" or *"between a rock and a hard place.*" Appellant was left with the choice of leaving his home, a place where he lawfully had the right to be, leaving a trespasser in his home who irrefutably has struck him in the face and begun to destroy his property, or having a DVCPO granted because he used reasonable force to remove her from his property. The decision of the majority leaves men and women in a predicament where upon gaining entry by permission, the homeowner cannot use reasonable force to remove an ex-lover from the home because of a current or prior domestic relationship. This ruling will lead to homeowners being faced with a choice that is unreasonable and illogical when the trespasser refuses to leave. Because the majority finds that appellant, and anyone who is similarly situated, is left with this strongly undesirable choice, I respectfully dissent.

### 1. **Appellee was a Trespasser**

{¶ 39} There is no dispute that appellant used force against appellee in an effort to remove her from his home, as "force" means "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1); *Calicoat v. Calicoat,* 2d Dist. No. 08CA32, 2009-Ohio-5869, ¶ 42. Appellant admitted at the hearing that he used force against appellee, but he claimed it was "reasonable force to get her out of my mom's house because I didn't want her to damage anything else." (Oct. 1, 2020 Tr. at 132-33.) The undisputed evidence establishes that appellee's fierce struggle to remain in appellant's home substantially increased the amount of force reasonably required to remove her and keep her from reentering.

{¶ 40} R.C. 2911.21(A)(1) defines criminal trespass as follows: "No person, *without privilege to do so*, shall * * * [k]nowingly enter or remain on the land or premises of another." (Emphasis added.) For purposes of a criminal trespass, " '[p]rivilege' means an immunity, license, or right conferred by law, bestowed by express or implied grant, arising

out of status, position, office, or relationship, or growing out of necessity."   R.C. 2901.01(A)(12).   Similarly, "[a] common-law tort in trespass upon real property occurs when a person, *without authority or privilege*, physically invades or unlawfully enters the private premises of another whereby damages directly ensue even though such damages may be insignificant."   (Emphasis added.)   *Linley v. DeMoss*, 83 Ohio App.3d 594, 598 (10th Dist.1992).   *See also Apel v. Katz*, 83 Ohio St.3d 11 (1998).

{¶ 41}  The Supreme Court of Ohio has repeatedly stated that any privilege granted by a landowner under R.C. 2901.01(A)(12), may terminate or be revoked.  *Mosher v. Cook United, Inc.,* 62 Ohio St.2d 316 (1980), citing *State v. Steffen*, 31 Ohio St.3d 111 (1987).  *See also State v. Wilcox*, 10th Dist. No. 15AP-957, 2016-Ohio-7865, ¶ 32-33.  This concept is inherent in the definition of trespass, which states that one may not without privilege "enter or *remain* on the land or premises of another."  (Emphasis added.)  R.C. 2911.21(A)(1); *Steffen, supra* at 115.  It is also inherent in the definition of privilege.  The Supreme Court of Ohio has also held that a person who lawfully enters the premises becomes a trespasser and the privilege is terminated by virtue of the commission of an assault upon the resident. *Steffen* at 115, ("the jury was justified in inferring from the evidence that appellant's privilege to remain in [the] home terminated the moment he commenced his assault on [the victim]").

{¶ 42}  Appellee testified that appellant's niece permitted her to enter his home. Appellee testified "we're not allowed to contact each other through anything but email," yet she entered the home of appellant.  (Tr. at 47.)  Appellant testified appellee entered his home without permission, refused to leave when asked, struck him on the head with a computer charger and knocked over his mother's laptop computer.

{¶ 43}  Appellant irrefutably testified and the undisputed evidence in this case shows that, prior to the time appellant first placed his hands on appellee to shove her out of the study, appellant unequivocally demanded that she leave his home, but she refused. Appellee admitted at trial that immediately upon her entry into the study area appellant began screaming at her, calling her a "bitch," telling her to "*get the fuck out of my house.*" (Emphasis added.)  (Tr. at 29.)  Appellee further testified that B.J. began crying and appellant told her, "[B.J.] is not going anywhere but *you can get the fuck out.*"  *Id.*  Appellee admitted she resisted appellant's efforts to remove her from the home, and grabbed and

nearly overturned a glass table-top in appellant's kitchen. Appellee does not deny holding on to appellant's shirt, refusing to leave, and attempting to reenter the home. Thus, the undisputed evidence shows that appellant unequivocally revoked appellee's privilege to remain in his home, that appellee was using force in attempts to regain entry, and that appellee was a trespasser at all relevant times.

{¶ 44} To the extent that appellee claims that she had a privilege to remain in appellant's home and/or reenter appellant's home to retrieve her son, the trial court acknowledged that the parties had joint custody of B.J., and appellee admitted that appellant was the custodial parent for educational purposes. Appellee also admitted that she permitted B.J. to attend school remotely from appellant's home on September 15, 2020. Appellee did not claim that appellant refused to release her son. Rather, appellee stated that appellant told her B.J. could leave when he finished his test. The trial court found that appellant posed no danger to his son on September 15, 2020, and refused to issue a DVCPO in regard to B.J.

{¶ 45} Moreover, appellee was not recalled to the witness stand to refute appellant's testimony that she struck him on the head with a computer charger and knocked over his mother's laptop computer. Therefore, even if the trial court believed appellee lawfully entered appellant's home on September 15, 2020, she became a trespasser and the privilege was terminated by virtue of her commission of an assault upon appellant. *Steffen* at 115. Appellant has the right to protect himself from physical harm and to protect his residence. To ask him to allow appellee to remain in his home or to retreat from his own home or to continue to suffer physical attacks to his person and his residence, flies in the face of the laws of Ohio. A person who is lawfully in his own home may use reasonable force to defend himself and his property and has no duty to retreat. Thus, appellant cannot be subject to civil liability, including a DVCPO, on these undisputed facts.

{¶ 46} Similarly, force may be used in defense of personal property if the owner " 'reasonably believed that his conduct was necessary to defend his property against the imminent use of unlawful force, and the force used was not likely to cause death or great bodily harm.' " *State v. Moses,* 10th Dist. No. 13AP-816, 2014-Ohio-1748, ¶ 41, quoting *State v. Bruckner*, 8th Dist. No. 63296, 1993 Ohio App. LEXIS 4643 (Sept. 30, 1993), citing *Columbus v. Dawson*, 33 Ohio App.3d 141 (10th Dist.1986). "One may act in self-defense,

or in defense of property, at either the same time or in succession." *Moses* at ¶ 41, citing *Columbus v. Eley*, 10th Dist. No. 91AP-803, 1992 Ohio App. LEXIS 355 (Jan. 28, 1992).

{¶ 47} Based on the undisputed evidence in the record, appellee was a trespasser in appellant's home on September 15, 2020. The majority acknowledges appellant had a legally protected right to use reasonable force to remove appellee from the residence, and that appellee was subject to forceful removal. *State v. LeFevre*, 10th Dist. No. 94AP-1376, 1995 Ohio App. LEXIS 1829 (May 4, 1995), *State v. Snowden*, 7 Ohio App.3d 358, 362 (10th Dist.1982). Appellant has maintained throughout this litigation that appellee was an uninvited guest in his home and appellee's own testimony establishes that she refused to leave when order by appellant to do so. Thus, the facts of this case demanded consideration of appellee's status as a trespasser to real property, regardless of whether appellant argued defense of personal property or self-defense. There is no dispute that appellee's conduct in striking appellant and damaging personal property occurred during appellee's trespass to real property. In my view, the trial court erred when it failed to acknowledge appellee was a trespasser and failed to consider her status as a trespasser in conducting the analysis

### 2. Appellant's conduct did not threaten imminent "serious physical harm."

{¶ 48} To obtain a DVCPO pursuant to R.C. 3113.31, the petitioner must prove by a preponderance of the evidence that the respondent has engaged in an act of domestic violence against petitioner or petitioner's family or household members. *Crabtree v. Dinsmoor*, 10th Dist. No. 13AP-342, 2013-Ohio-5797, ¶ 10, citing *Felton v. Felton*, 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. R.C. 3113.31(A)(1) defines "domestic violence" in relevant part as follows:

> (a) The occurrence of one or more of the following acts against a family or household member:
>
> (i) Attempting to cause or recklessly causing bodily injury;
>
> (ii) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code[.]

{¶ 49} Appellee sought a DVCPO exclusively under R.C. 3113.31(A)(1)(a)(ii). Before a court may grant a DVCPO under R.C. 3113.31(A)(1)(a)(ii), petitioner must show, by a preponderance of the evidence, respondent placed the petitioner "by the threat of force in

fear of imminent serious physical harm." *Halcomb v. Greenwood,* 12th Dist. No. CA2018-03-008, 2019-Ohio-194, ¶ 38. "Force" is not defined in R.C. 3113.31, but it is defined elsewhere for purposes of the Ohio Revised Code as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

**{¶ 50}** R.C. 2901.01(A)(5) defines "serious physical harm" in relevant part as follows:

> (5) "Serious physical harm to persons" means any of the following:
>
> * * *
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> * * *
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

**{¶ 51}** By contrast, this court has determined that the term "bodily injury," for purposes of the offense of domestic violence under R.C. 3113.31(A)(1)(a)(i) means any injury, regardless of its gravity or duration. *J.R. v. E.H.*, 10th Dist. No. 16AP-431, 2017-Ohio-516, ¶ 13.

**{¶ 52}** My review of the trial transcript reveals insufficient evidence to support a conclusion appellant engaged in conduct that would have placed a reasonable person, in appellee's position, in fear of imminent *serious* physical harm as pleaded on September 15, 2020. The evidence at the hearing is similarly insufficient to support a reasonable conclusion, by a preponderance of the evidence, that appellant actually placed appellee in fear of imminent *serious* physical harm on September 15, 2020.

**{¶ 53}** The majority finds that because appellant's arguments in support of his first assignment of error primarily challenge the trial court's assessment of the weight and credibility of the evidence, appellant has conceded that appellee presented sufficient evidence to support a finding that he placed appellee in fear imminent serious physical harm. As a general rule, however, "courts of appeal decide appeals on assignments of error, not arguments or issues contained in a brief." *Mid Am. Constr., LLC v. Univ. of Akron,*

10th Dist. 18AP-846, 2019-Ohio-3863, ¶ 23, *Wood v. Simmers*, 10th Dist. No. 17AP-269, 2017-Ohio-8718, ¶ 7, citing *Hamilton v. Hamilton*, 10th Dist. No. 14AP-1061, 2016-Ohio-5900, ¶ 9.  Appellant's first assignment of error expressly challenges the sufficiency of the evidence.

{¶ 54} Given the well-settled and comprehensive standard of review this court must employ in the review of a challenge to the sufficiency of the evidence, the fact that appellant's argument focuses on the weight of the evidence does not amount to a waiver or concession of the sufficiency challenge expressly raised by the first assignment of error.  The argument is self-evident in this case.  In ruling the judgment was not against the manifest weight, the majority impliedly rules that sufficient evidence supported the judgment.  I simply disagree with the sufficiency ruling.

{¶ 55} In *Fleckner v. Fleckner,* 177 Ohio App.3d 706, 2008-Ohio-4000, ¶ 20 (10th Dist.), this court described the type of evidence required to support a DVCPO under R.C. 3113.31(A)(1)(a)(ii):

> Civil protection orders are intended to prevent violence before it happens. Where a trial court grants a CPO based on a petitioner's fear of imminent serious physical harm. The critical inquiry under R.C. 3113.31 is whether a reasonable person would be placed in fear of imminent (in the sense of unconditional, non-contingent) serious physical harm. This inquiry necessarily involves both subjective and objective elements.
>
> * * *
>
> In order to grant a protective order, the evidence must be clear and unequivocal that the petitioner was placed in fear of imminent physical harm. The evidence must reveal a nexus between the communication directed to a petitioner with subsequent actual fear of imminent, serious physical harm. While an objective standard is to be applied to the impact upon a victim's state of mind as it relates to threatening communications, the evidence must be unequivocal.

(Internal citations and quotation marks omitted.)  *Fleckner* at ¶ 20.[6]

---

[6] Our decision in *Fleckner* suggests a verbal "threat of force" is required to sustain a DVCPO under R.C. 3113.31(A)(1)(a)(i). Under Ohio law, a "threat of force" and a "use of force" are distinctly different types of conduct. *See* R.C. 2907.05, defining the offense of gross sexual imposition; R.C. 2907.04, defining the offense of unlawful sexual conduct with minor; and R.C. 2941.1419, setting forth certain specifications in cases of

{¶ 56} The degree of force established by the evidence was clearly insufficient to meet appellee's burden of proof under R.C. 3113.31(A)(1)(a)(ii).  As previously noted, "serious physical harm" for purposes of a DVCPO under R.C. 2901.01 means "physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity," or "involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." *Fleckner at* ¶ 19.  Appellee testified that during the September 15, 2020 incident, appellant's conduct included "grabbing me up and throwing me around the house to push me out the door * * * slamming me into the refrigerator, throwing me outside; and then he came outside, threw me down the steps, and kicked me."  (Tr. at 30.)  Appellee's mother testified that she saw appellant "stomp" on appellee as she was "hanging on to the steps."  (Tr. at 80.)  Based upon appellee's own testimony, the contact between the parties was made in appellant's attempt to remove her from the home, not threaten her with serious physical harm.  Appellee admitted that she put up a fierce struggle to remain in appellant's home and to reenter the home after being removed.

{¶ 57} Officer Parks testified that he arrived at the scene approximately 30 minutes after receiving the call.  He testified that he did not observe any signs that appellee had been in an altercation, and she refused medical treatment at the scene.  With regards to the allegation that appellant kicked or stomped on appellee, which I perceive to be the most serious allegation, appellee's testimony was that "he kicked me and I instantly hopped back up and tried to run into the house so I could grab B.J."  (Tr. at 31.)  This testimony does not support a finding, by a preponderance of the evidence, that appellee feared she would suffer temporary or substantial incapacity, lasting acute pain, or prolonged or intractable pain as a result of appellant's conduct on September 15, 2020.

{¶ 58} Appellee nevertheless testified that she suffers from diabetes, and she claimed that her condition results in delayed manifestation of physical injuries.  She also testified that she experienced significant and debilitating pain in the days after the incident and she required hospitalization.  Appellee argues that a reasonable person with her medical condition, would have feared imminent serious physical harm on September 15,

---

attempted rape. Nevertheless, I do not disagree that, under the appropriate circumstances, a DVCPO may be granted under R.C. 3113.31(A)(1)(a)(ii) based solely on conduct.

2020. This court has expressly rejected this very argument. In *Fleckner*, we noted that "neither this court nor the Supreme Court of Ohio has applied the 'thin skull rule' to civil protection orders under R.C. 3113.31." *Fleckner* at ¶ 22.

{¶ 59} Appellee also submitted several photographs showing bruises and swelling to her face and right eye. Appellee admitted that some of the photographs may have been taken after she underwent previously scheduled eye surgery on September 27, 2020. The trial court found the photos of little probative value. We agree.

{¶ 60} In ruling from the bench, the trial court acknowledged that "[appellant] may not have intended to do anything." (Tr. at 154.) Indeed, the evidence in the record reveals that appellee's injuries resulted, to a large degree, from her efforts to resist ejection from the home rather than appellant's use of force. Thus, some of appellee's fear was caused by her own conduct, rather than appellant's. Moreover, appellee never testified she feared imminent *serious* physical harm during the incident. The relevant portion of her direct examination is as follows:

> Q. [D.D.], how did you feel during this incident?
>
> A. Scared. He's never -- no matter how many times he put his hands on me in the past, he never did it in front of our son.
>
> Q. Okay.
>
> A. He's never called me out of my name he usually, like, whispers it in my ear or pulls me into another room. For him to do it directly in front of B.J. and then just B.J., the way he -- I could hear my baby's screams in my ear.

(Tr. at 40.)

{¶ 61} Appellee also answered in the affirmative when counsel asked her if she "feared" appellant. (Tr. at 44.)

{¶ 62} In order to grant a protective order, the evidence must be clear and unequivocal that the petitioner was actually placed in fear of imminent serious physical harm. *Fleckner* at ¶ 20. In our view, appellee's testimony she was "scared" on September 15, 2020, and that she "feared" appellant, does not permit an inference that appellee feared imminent serious physical harm on September 15, 2020. *See A.M. v. D.L.*, 9th Dist. No. 16CA0059-M, 2017-Ohio-5621, ¶ 21. (Petitioners testimony that " '[respondent] shouldn't be able to just walk into my house especially when he didn't tell

me that he was bringing [our son] over' indicates that she sought a protection order only so that [respondent] would be prevented from going to her residence or contacting her, not because she had a fear of imminent physical harm."). Under Ohio law, "[t]he reasonableness of the fear should be determined with reference to the history between the petitioner and the respondent." *Fleckner* at ¶ 21, quoting *Bahr v. Bahr,* 5th Dist. No. 03 COA 011, 2003-Ohio-5024, ¶ 29. Appellee related that on prior occasions, appellant "popped" her in the head. Appellee explained the incident to the trial court as follows:

> A. When I say he popped me, he smacked us in the back of our head. It's never with a closed fist when he's popping it. It's just more smacking in the head. Like, you will get a pop in the face. Little -- like, little jabs like this on the leg or whatever. It's not stuff that people notice.
>
> Q. Okay. And you -- have you called the police often after any of these incidents have occurred?
>
> A. I never called the police before, and even in 2018 it was my mom that called the police.
>
> Q. Okay. And why don't you call the police?
>
> A. It's embarrassing.

(Tr. at 41-42.)

**{¶ 63}** Appellee testified about another incident that occurred at the hospital while her son was being treated for an accidental overdose of insulin. According to appellee, appellant was "trying to drag me out of the hospital and when he was trying to throw me out of the room, he had his arm around my face. And I started to bite him so he would let me go, and that was the mark that he had on him." (Tr. at 62.) No charges were filed against appellant as a result of this incident.

**{¶ 64}** In order to grant a protective order under R.C. 3113.31(A)(1)(a)(ii), the evidence must be clear and unequivocal that the petitioner was actually placed in fear of imminent serious physical harm. *Fleckner* at ¶ 24, citing *Coughlin v. Lancione,* 10th Dist. No. 91AP-950, 1992 Ohio App. LEXIS 874 (Feb. 25, 1992). These prior incidents of alleged domestic violence were not sufficiently egregious to cause appellee to fear of imminent serious physical harm on September 15, 2020. Moreover, unlike the prior incidents, appellant was a trespasser on September 15, 2020, and the evidence shows that any injuries

she may have sustained on September 15, 2020, were caused, in large part, by her efforts to resist ejection.

### 3. The trial court conflated R.C. 3113.31(A)(1)(a)(i) and 3113.31(A)(1)(a)(ii)

{¶ 65} In my opinion, this is a case where bad facts and a flawed pleading resulted in bad law. A petition seeking a DVCPO based solely on domestic violence as defined in R.C. 3113.31(A)(1)(a)(ii) must be amended before the court may consider a DVCPO under another provision in R.C. 3113.31(A)(1)(a). *Wedlake v. Elswick*, 2d Dist. No. 28873, 2021-Ohio-1119, ¶ 36. Appellee, however, did not seek a DVCPO under R.C. 3113.31(A)(1)(a)(i), and she did not move the trial court to amend her petition to include an allegation that appellant committed domestic violence by "[a]ttempting to cause or recklessly causing bodily injury." Appellee proved that she sustained some degree of bodily injury on September 15, 2020, but the photographs submitted by appellee were given little weight by the trial court after appellee admitted that she had eye surgery that may have accounted for her bruising in the photos. Appellee's testimony established appellant used force to remove her from his home, but her testimony does not permit a finding that she experienced the type of fear required to obtain a DVCPO under the section in which she petitioned.

{¶ 66} In my view, the trial court conflated R.C. 3113.31(A)(1)(a)(i) and 3113.31(A)(1)(a)(ii), and in so doing, failed to consider appellee's status as a trespasser, and blurred the important distinction between "causing a bodily injury" and "threatening imminent serious physical harm." The trial court's merger of the two statutory provisions is evidenced by the language the trial court chose to use in making its findings. In announcing its decision of the record, the trial court stated: "The Court finds the [appellee] was placed in fear of -- imminent fear of physical harm by the threats and/or actions of the [appellant] and that the fear was objectively reasonable given the circumstances of the case." (Tr. at 154.) The trial court also stated that "someone was in fear of serious physical harm," but did not find that the fear of *serious* physical harm was objectively reasonable. *Id.*

{¶ 67} Moreover, appellee's own testimony establishes that she was a trespasser in appellant's home. Under the circumstances, appellant had a legally protected right to use reasonable force to remove appellee from the residence, which means that appellee was

legally subject to forceful removal. *LeFevre*; *Snowden* at 362. Force is not unreasonable simply because it causes a physical injury to the trespasser, as the use of reasonable force to eject a trespasser is a defense to a criminal assault. *See* R.C. 2903.13(A).[7] *State v. Behnfeldt*, 5th Dist. No. 2020CA00105, 2021-Ohio-1915, ¶ 19. Appellee testified that she grabbed onto appellant's shirt attempting to reenter the residence. Appellee never denied that she struck appellant or attempted to destroy the computer in the living room of the residence where the child was doing his schoolwork, and she testified that she stumbled down the steps.

{¶ 68} Further, appellant is under no duty to flee his own residence when a trespasser refuses to leave and is destroying his property. In granting the DVCPO, the trial court reasoned that "weighing injuries to parties as opposed to damage to property, it weighs in her favor." (Tr. at 153.) The trial court's reasoning is misplaced as it disregards appellee's status as a trespasser and fails to acknowledge appellant's legal right to use force in removing her from the premises.

{¶ 69} The majority concludes, however, that the trial court "implicitly" found appellant used unreasonable force in removing appellee from his home. I do not believe the trial court addressed this issue at all given the fact that the trial court's decision fails to acknowledge appellee's status as a trespasser. In announcing the decision, the trial court never uses the words "trespass" or "trespasser." Moreover, the trial court could have found that appellant used reasonable force but did not provide appellee with reasonable notice to leave. It is speculation to make either assumption on a silent record. In any event, a finding that appellant used an unreasonable degree of force, under the circumstances, and caused bodily injury to appellee in the process or removing her from the premises, does not mean that appellant necessarily caused appellee to fear imminent *serious* physical harm as that term is used in R.C. 3113.31(A)(1)(a)(i). This leap in logic is one of the troubling aspects of the trial court's decision.

{¶ 70} I am concerned the majority decision could be cited for the proposition that a trespasser may obtain a DVCPO against the homeowner under R.C. 3113.31(A)(1)(a)(ii) if the trespasser sustains some degree of physical harm in the process of being forcibly

---

[7] R.C. 2903.13 provides in relevant part that "[n]o person shall knowingly cause * * * physical harm to another."

removed from the premises. This is particularly true in this case, where appellee's own testimony established that she stubbornly refused to leave appellant's home when asked to do so and ferociously resisted appellant's efforts to physically remove her from his home and prevent her reentry. Specifically, the testimony shows that appellee struck appellant with a computer charger after she was asked to leave, struggled mightily with appellant from the moment he placed his hands on her, nearly upended a glass table during the struggle to remain in the home, and grabbed appellant's shirt and refused to let go after appellant removed her from the home. This evidence is undisputed. Thus, the undisputed evidence shows that a greater degree of force was reasonable and necessary, under the circumstances, to remove appellee from appellant's home. The trial court, however, did not identify appellee as a trespasser or properly account for her conduct in ruling on the DVCPO.

{¶ 71} I agree with the majority that the amount of force that is reasonable, under the circumstances, is a factual issue. That does not mean that the issue evades a sufficiency analysis. Therefore, I cannot agree on this record that sufficient evidence was presented to sustain a finding that appellant used unreasonable force against appellee under the circumstances that existed on September 15, 2020.

{¶ 72} Under the particular circumstances of this case, appellee was required to plead and prove facts that clearly and unequivocally established appellant used an unreasonable degree of force in removing her from his premises and that appellant's use of force, rather than appellee's resistance to that force, would have caused a reasonable person in appellee's position to fear imminent serious physical harm, appellee actually feared imminent serious physical harm. Appellee did not do so. It was also imperative, under the circumstances, for the trial court to make the specific findings required under R.C. 3113.31(A)(1)(a)(ii). The trial court did not do so.

{¶ 73} A homeowner in appellant's position should not be required to choose between suffering a continuing trespass and subjecting himself to a DVCPO. I would sustain appellant's first, second, and third assignments of error and reverse the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch. Because the majority does not, I respectfully dissent.